Hillsborough,
No. 5201.

CECILE GOSSELIN HOYT

*v.*

VICTOR F. HORST, d/b/a

ARTHUR MURRAY STUDIO OF MANCHESTER &*a.*

Argued April 7, 1964.
Decided June 2, 1964.

*Sheehan, Phinney, Bass, Green & Bergevin* (*Mr. Gerard O. Bergevin* orally), for the plaintiff.

*Sullivan, Gregg & Horton* and *Charles F. Kazlauskas, Jr.* (*Mr. Kazlauskas* orally), for the defendant Victor M. Horst.

*David A. Brock* and *Devine, Millimet, McDonough, Stahl & Branch* (*Mr. Brock* orally), for the defendant Charles T. Collins.

BLANDIN, J. A fundamental issue before us is whether the Court properly left it to the jury to decide whether the defendant Horst was an undisclosed principal in the dealings between the plaintiff Mrs. Hoyt and the defendant Collins. To determine this requires a somewhat detailed examination of the facts.

Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff (*Shimkus* v. *Caesar,* 95 N. H. 286; *Lamarche* v. *Granite State &c. Ins. Co.,* 101 N. H. 210), the jury could find the following: For many years

prior to and including the period of the happenings which gave rise to this case, Horst had been associated with the Arthur Murray Studios, Inc. He was the sole owner, by lease from this organization, of the franchise rights of a number of Arthur Murray Studios operating in various places in New England. Under the terms of his contract with the Murrays, owners of the studios, Horst had the duty "to maintain the highest standard of . . . behavior among the personnel employed by the lessee [Horst] and lessee agrees to use all efforts to maintain existing standards to this effect."

In the exercise of his franchise, Horst from time to time contracted away so-called studio managerial rights in different cities to various persons. These persons, in turn, often employed assistant or sub-managers. He specifically contracted such rights in Manchester by a written agreement to one Theodore Wettig by a contract dated January 8, 1959, and upon termination of this arrangement, to the defendant Collins by a similar instrument dated May 25, 1959. Neither Wettig, Collins nor any other person could actually purchase a studio — all they could obtain was the privilege of running it as "employees" of Horst, who reserved the power to hire and fire all employees of the studio. Wettig and Collins were bound by their contracts with Horst to observe all conditions therein and "in general, supervise the operation of said studios in strict accordance with . . . the rules and regulations given to the employee[s] [Wettig and Collins] by the employer [Horst]." Among other regulations included in the standard of behavior as prescribed by the contracts was one to the effect that no manager should obtain a loan from a customer.

All employees whom the so-called managers Wettig and Collins hired had to be approved by Horst. Wettig and Collins were bound to pay all running expenses of the studio. To insure that they did so, they were obligated to deposit the gross receipts in a bank from which Horst would take three per cent weekly until an escrow sum of $12,500 was on hand. This was to be used by Horst, if necessary, to satisfy obligations to creditors or others, and when these obligations were satisfied, the balance, if any, due the managers was paid them.

Although Horst insisted that he remain in the background and that his name should not be used by his employees in any dealings with other persons, he registered in New Hampshire as "Victor F. Horst, doing business as Arthur Murray Studio of

Manchester." In the event that the studio bills were not paid by a manager, Horst conceded that he was bound to satisfy the creditors.

In summary, the jury could find that studio managers, including Collins, Wettig, and in turn their employees, were all, in the last analysis, employees of Horst, subject to strict and detailed control in their actions, and that Horst kept a firm hand on the managerial reins of the entire studio operations.

Collins first came to Manchester in late 1957 and finally left Horst's employ in September, 1962. Throughout the years that he remained in Manchester, he was working for the Arthur Murray Studio of Manchester. When he first came to Manchester, two persons named respectively Belmore and Bradley had general managerial rights in both Worcester and Manchester studios. The Manchester studio opened in February of 1958. Belmore and Bradley did not actually work in Manchester and Collins, while there, attended to the running of the operation, either alone or, as hereinafter described, for a time as co-manager with Wettig. When Collins entered the employ of Belmore and Bradley, who owned only the general managerial rights in the Manchester operation, he also had a contract with Horst, the real owner of the studio, whose authority was superior to that of Belmore and Bradley. The reason for this was that Horst not only retained the power under his contract with Belmore and Bradley to approve or disapprove anyone they might hire, but also, it was stipulated as to Belmore's and Bradley's contract with Collins that this "agreement shall be signed by employer [Horst] if he approves such selection." Horst did approve the employment of both Collins and Wettig.

Theodore Wettig came to the Manchester studio in November of 1958, having been sent there by Belmore and Bradley as a sort of efficiency man. Horst was aware of this. The plan was for Wettig to take over the full management there upon Collins' anticipated move to Lawrence, Massachusetts. Until this should occur, Wettig and Collins were to work together as co-managers, in order to give Wettig a chance to become acquainted with the Manchester operations. Horst knew this and at this time, in effect, both men were employees of the Manchester studio and of Horst.

Shortly after Wettig came to Manchester, both he and Collins began to "talk" to the plaintiff, then Mrs. Cecile Gosselin, now Mrs. Cecile Gosselin Hoyt, to the effect that the studio was for

sale, that it was a fine investment, and that Wettig wished to buy it. They represented to the plaintiff that the Murray Studio never closed its doors, that it was making money, that Wettig was an experienced man, and that if she would loan him $15,-000 to "buy" the Manchester studio, she would get $21,000 in two years' time. In brief, they persuaded her that it was a "wonderful" deal. They finally induced her to make the loan of $15,000 to Wettig. The check she drew for this was dated January 7, 1959, and certified January 8, 1959. Wettig never actually purchased the studio, although, as previously stated, he signed an agreement on January 8, 1959, with Horst, to manage it; in other words, he bought managerial rights, as previously described. The $15,000 check which the plaintiff gave to Wettig, he in turn gave to Horst. Most of the proceeds of the check went to pay the creditors of the Worcester studio, including Horst himself. Within two months after the plaintiff made her loan to Wettig and he had taken over the studio, she "sensed" that something was wrong and found that Wettig had left Manchester. He had made some payments on the loan, reducing it from $15,000 to $13,100, and then payments had ceased.

The plaintiff became very disturbed and got in touch with Collins, who in the meantime had not gone to Lawrence as planned, but instead had taken over the management of the Worcester, Massachusetts, studio, directly under Horst and replacing Belmore and Bradley, after leaving Manchester early in February, 1959. Collins found that the Worcester studio was in financial difficulties and owed creditors, including Horst, in excess of $13,000. When Mrs. Hoyt first called Collins, she asked him to take over the Manchester studio. He told her he could not do this, as he was "strapped" financially and obligated to the Worcester studio.

At about the time the plaintiff called Collins, Hector Alexander, a lawyer employed by Horst as his regional manager and director, learned of the troubles in Manchester. He telephoned Collins, and with Horst on the line, a "three way" conversation ensued. In this conversation, Horst himself instructed Collins to go to Manchester, "get Wettig out of there, and take over the studio." He further told Collins to arrange to reimburse the plaintiff for the amount of Wettig's loan by paying her five per cent of the gross regularly and interest at six per cent.

Collins went to Manchester and talked with the plaintiff and

her husband along the lines which he had been instructed to follow by Horst. She asked Collins if he would put the proposal in writing. He did so, in his own handwriting, on May 25, 1959, written on the stationery of Mr. Hoyt, in an instrument which provides as follows:

"Principal amount   13,100.00

Mrs. Hoyt and I agree as follows (In the event that I take over the Manchester studio)

That the principal amount of money to be pd. back to Mrs. Hoyt is 13,100.00. It will be pd. as follows. 5% of the monthly gross to be pd. by 5th of the month for the preceding month. 6% interest will be charged annually on the principal amount.

$$\begin{array}{r} 13100 \\ 6 \\ \hline 786.00 \end{array}$$

For example — If 5000.00 were to be pd. to Mrs. Hoyt in the final year 786 would be deducted for interest and 4214 would be deducted from the principal leaving 8,886 to be figured at 6% or 445.16 to be deducted from the gross amount pd. to Mrs. Hoyt in the second year and the balance of that to be deducted from the principal.

/s/ C. T. Collins
/s/ Mrs. Hoyt"

Although there was some conflict in the testimony as to whether this was an "integrated" contract, the conflict was for the jury to resolve. The parties appear finally to have interpreted the instrument in a practical way according to its terms until the breach. From the evidence, the jury could and did properly construe from the words and actions of the parties that their intent was to make a binding agreement in accordance with the terms of the contract. *H & B Construction Co.* v. *James R. Irwin & Sons*, 105 N. H. 279; *Bogosian* v. *Fine*, 99 N. H. 340, 342.

The reason that Horst was not mentioned in this agreement was because of his strict instructions to keep his name out of all studio affairs in dealings with customers and others. However, Horst knew what was in the agreement. A few small payments were made under this contract, but these ceased in December, 1959, leaving a balance due the plaintiff of $12,350 without interest. The payments to the plaintiff were made from the accounts of the Arthur Murray Studio of Manchester or the

Arthur Murray Studio of Worcester, Massachusetts. It could be found that it was actually Horst's money from which the payments were made. Throughout the negotiations with the plaintiff and in signing the agreement, Collins testified that he understood, and that he was acting for his employer, Horst, and in pursuance of the latter's instructions.

Collins remained with the Manchester studio until sometime after there was a fire on January 11, 1960. The fire loss was around $25,000. Collins had taken out insurance policies on this studio and paid the premiums. However, these policies after the fire were assigned to Horst, who claimed all the proceeds.

The plaintiff never saw Horst until the trial. She had no communications with him of any sort, as far as the evidence discloses, while the negotiations were going on which resulted in the agreements previously described. Although she knew there was such a person, it does not appear when she first learned of his existence. In making the agreement with Wettig and Collins, she dealt directly only with them.

She had entered into her purchase contract with Wettig on the strength of her faith in Collins. At this time, she understood that Collins was working for Belmore and Bradley. After Wettig had left Manchester and the agreement to pay her back was made with Collins, he failed to make payments. When this happened, the plaintiff directed all her importunities at Collins and never approached Horst or contacted him in any way at this time. Aside from one or two vague and equivocal references to Horst's name, there is no evidence that the plaintiff was aware of the part he played in the dealings that she had with Wettig or Collins. Throughout the proceedings, Horst was kept in the background, and she was expressly told by Collins that Horst was not involved.

In this state of the record, we think it reasonably plain that it was for the jury to decide whether Horst was a principal in the dealings between Collins and the plaintiff. Collins' unequivocal testimony that Horst, his employer, directed him to go to Manchester and arrange with the plaintiff to satisfy Wettig's obligation to her, coupled with all the attendant circumstances, furnished a sufficient basis for the jury's finding that the defendant Collins was the defendant Horst's agent. *Carroll* v. *Dane*, 89 N. H. 233; *Riley* v. *Bank*, 86 N. H. 329, 331; see Restatement (Second), Agency, *s.* 190. Horst's motion for a non-

suit as to the count in assumpsit, upon the grounds that there was no evidence to submit to the jury that he employed Collins as an agent, was properly denied, and his exception thereto is overruled.

In regard to the further issue as to whether Horst was a disclosed or undisclosed principal, Collins argues that the effect of the Court's instructions to the jury to direct a verdict against Collins were erroneous, unless it must be held as a matter of law that there was no evidence upon which the jury could find Horst a disclosed principal. Restatement (Second), Agency, s. 320. He furthermore insists that there was evidence that Horst was a disclosed principal. It is true that the Court's instructions in effect directed the jury to find that Horst was an undisclosed principal, if they found that he *was* a principal, since they were instructed that they could not return a verdict against Horst without also finding Collins liable. *Cf.* Restatement (Second), Agency s. 320, *supra*.

The evidence upon which Collins chiefly relies as furnishing a basis for a jury finding that the plaintiff was actually aware of the agency relationship between Horst and Collins is as follows: Transcript, *p.* 22: "Q. Did you ever see Mr. Horst before today? A. No. Never. Q. Did you ever hear of him before today? A. Plenty. Q. By whom? A. Around the studios, and from Mr. Collins, Mr. Wettig. Q. Did you ever have the impression in the making of the loan to Mr. Wettig that you had an interest in anything in that studio? A. I certainly did. Q. In what? A. In the whole studio; that they couldn't sell the studio or change the management until the whole amount was paid me. Q. Did you find out differently? A. Yes, I did —to my sorrow. Q. When? A. When Mr. Wettig left and Mr. Collins then talked to me about it. Also, I remember his saying he had to see Mr. Horst in Boston, and that Mr. Wettig had been called on the carpet, or something of that sort." [Admitted as against Collins].

Transcript *p.* 29: "Q. He also told you that he would have to get permission from Mr. Horst and Mr. Wettig before he could come into the Manchester studio? A. That is correct. Q. And didn't he tell you that if he was able to work something out between Mr. Horst and Mr. Wettig, he would be willing to come in and bail you out, if he could? A. Yes, he did. Q. Didn't you then ask him to put something down in writing as evidence of what he was proposing to do for you? A. Yes."

We are unable to agree that a finding of the plaintiff's actual knowledge of the agency relationship could properly be based upon this vague and nebulous testimony that she was aware that Horst existed and that if Collins could "work something out between Mr. Horst and Mr. Wettig, he would be willing to . . . bail [her] out." The statements at the best are equivocal and if anything more indicative of contractual arrangements between Horst and Wettig than of any agency relationship between Collins and Horst.

In summary upon this phase of the case, we hold as a matter of law that Horst could not be found to be a disclosed principal. In this situation, the Court's instructions were not error and Collins' exception to them is overruled. Restatement (Second), Agency, ss. 186, 322.

Since Horst was found to be an undisclosed principal, he could be held liable on the contract. *Holman-Baker Co.* v. *Pre-Design Co.*, 104 N. H. 116. Furthermore, the plaintiff had a right to join both defendants in her action. Restatement (Second), Agency, s. 210A. Neither objected to the plaintiff's failure to make an election as to which one she would choose to hold; obviously, with both denying all liability, it would have been palpably unfair to force her to elect and gamble on which one the jury might find liable. The case has not yet gone to judgment, and we believe, at least in the absence of timely objection, that if the plaintiff prevails she may have judgment against both defendants. Restatement (Second), Agency, s. 210, *comment* b; 12 Neb. L. Bull. 100. We think such a rule consistent with the tenor of our laws, and while we are aware of contrary authority (see Restatement (Second), Agency, Appendix, Reporter's notes, s. 210), we choose not to follow it.

Save for the question of damages, which will be later discussed, Collins' motion to set aside the verdict, for a new trial and for judgment notwithstanding the verdict, appear to raise no further substantial issues than those of which we have already disposed.

The defendant Horst, in addition to his exception to the denial of his motion for a nonsuit on the assumpsit count, argues that his motions for a mistrial should have been granted on the grounds of prejudicial statements and evidence injected by plaintiff's counsel. The Court's denial of these motions and his refusal to set aside the verdict are entitled to great weight. *McLaughlin* v. *Union-Leader*, 100 N. H. 367, 369. Furthermore, an examination of the record convinces us that the Court's

instructions to the jury to disregard certain statements and evidence which the jury are presumed to follow (*Watkins* v. *Railroad*, 84 N. H. 124, 128) cured any errors upon which the defendant Horst relies. His exception to the denial of his motion for a mistrial cannot prevail.

Both Collins and Horst excepted to the Court's charge as to the measure of damages. Horst's position is that the contract, if it was enforceable at all, called for payment in installments. He says that in the event of a breach, the measure of damages is not the whole amount, but the present value of the contract. 25 C.J.S. 585.

Collins argues that if he should be found liable at all, his obligation must be limited to five per cent (5%) of the monthly gross from December 1959 (date of breach) to September 1962 (date of Horst's termination of Collins' employment contract as manager in Manchester).

We do not believe that the position of either defendant is sustainable. After November, 1959, until suit was brought in 1960, and even to the time of the trial which began in April 1963, not a single payment was made. There was not the slightest indication that any further installments would ever be received by the plaintiff. We are thus faced with the question "whether the breach is such that the plaintiff can regard it as 'total' and maintain action for [her] entire injury, however uncertain in amount and however far into the future it may occur . . . ." 4 Corbin on Contracts, *s.* 956, *p.* 841. Our answer to this question is that the breach was total and that the plaintiff's action for her entire injury is proper. 4 Corbin, *supra, s.* 963, *p.* 866; *s.* 966. See *Bates Street Shirt Co.* v. *Place*, 76 N. H. 448; *Lee* v. *Dow*, 71 N. H. 326.

The practical justice of allowing this procedure under the facts of the present case is plain. We recognize that there is authority for the proposition that where a contract is executed except for the payment of money in installments no relief for anticipatory breach will be granted until the time for payment arrives. However, we agree with Professor Corbin that courts should be able to deal with such a situation as here exists so as to avoid endless delays and multiplicity of suits. 4 Corbin, *supra, p.* 841. See also, *s.* 963, *p.* 866; see *Blanchard Co.* v. *Company*, 80 N. H. 161, 163. While we are acquainted with the fact that there is authority to the contrary (*Phelps* v. *Herro*, 215 Md. 223; 5 Williston on Contracts (Rev. ed.), *s.* 1328), we believe they do not meet the practical realities of such cases as this one,

as well as the view which we have hereby adopted.

So far as Collins' claim to limited liability on the grounds that he was discharged as manager of the Manchester studio in 1962 is concerned, we believe the jury correctly interpreted the intent of the parties that if Collins took over the management of the studio — as he did — he was bound to pay the entire amount in any event, and within a reasonable time. *Smith* v. *B.C.M. Railroad*, 36 N. H. 458, 484-485. 17A C.J.S., Contracts, *s.* 503 (1). Collins can take no advantage of the fact that difficulties arose between him and Horst. Furthermore, he had broken his agreement before he left the studio in 1962.

It thus appears that both defendants were liable, Collins who signed the agreement, and his undisclosed principal Horst, for the entire amount, with interest at six per cent. Restatement (Second), Agency, *s.* 210A; *s.* 322. However, she can have but one full recovery for her loss. *Aldrich* v. *Beauregard & Sons*, 105 N. H. 330.

In summary we hold that the denial of Horst's motions to set aside the verdict, for a new trial and for judgment notwithstanding appear to raise no questions of merit not already covered and the exceptions thereto are overruled.

With reference to the fraud count as against both defendants, it seems unnecessary to detail the voluminous evidence. Fraud is never to be presumed, but must be established by clear and convincing proof (*Lampesis* v. *Comolli*, 101 N. H. 279) and the circumstances must indicate with reasonable clarity that fraud was practiced. Here we conclude that no such circumstances were before the jury. When Collins suggested to the plaintiff that she "buy" the studio, the record discloses that the word was used loosely, in the sense of buying managerial rights. Such an interpretation is as consistent with fair dealing as with an intent to defraud. There was seller's talk and some other equivocal statements, but this is not sufficient. Without further elaboration, we hold that the Court properly directed verdicts for both defendants on the fraud count, and the plaintiff's exception is overruled.

What we have said appears to dispose of all exceptions briefed or argued, and no others of merit appearing in the record, the order is

*Judgment on the verdict.*

All concurred.