Hillsborough
No. 7610

## WILKO OF NASHUA, INC. & a.

### v.

## TAP REALTY, INC.
## STAR MARKET CO., INC. AND STAR MARKET CO.,
## DIVISION OF JEWEL COMPANIES, INC.

October 31, 1977

844

*McLane, Graf, Greene, Raulerson & Middleton, Arthur A. Greene, Jr.,* and *R. David DePuy* (*Mr. DePuy* orally), of Manchester, for Wilko of Nashua, Inc.

*Winer, Lynch, Pillsbury & Howorth* (*Mr. Robert W. Pillsbury* orally), of Nashua, for Cathay Plaza, Inc.

*Normand R. Pelletier,* of Nashua, by brief and orally, for TAP Realty, Inc.

*McDermott, Will & Emery* (*Mr. Theodore A. Groenke* orally), of Chicago, Illinois, and *Sheehan, Phinney, Bass & Greene* of Manchester, for Star Market Co., Inc. and Star Market Co., Division of Jewel Companies, Inc.

DOUGLAS, J.   This is an appeal from a series of actions in law and in equity. Plaintiffs Wilko of Nashua, Inc., and Cathay Plaza, Inc., claimed that TAP Realty, Inc., breached certain leases, and that Star Market Co., Inc., and Star Market Co., Division of Jewel Companies, Inc., intentionally interfered with the contractual relationships of TAP, Wilko, and Cathay. All questions of law were reserved and transferred by the Trial Court (*Johnson, J.*).

TAP originally secured a ground lease in Nashua in 1971, which provided that TAP could sublease without approval of the owners but required written consent before assignment of the lease. Subsequently, Wilko and Cathay entered into leases with TAP. Wilko was to operate a Kentucky Fried Chicken outlet, and Cathay was to operate a Chinese restaurant. Both leases were recorded. TAP

and Star then began to negotiate about the possibility of locating a food market in the same tract. Cathay and Wilko agreed with TAP to permit a reasonable delay in going forward with their agreements during the negotiations. However, a binding lease agreement was never reached between Star and TAP.

On May 10, 1972, Lawrence J. Madfis, counsel for Star, and Ted Pelletier, TAP's president, met at Madfis' Brookline, Massachusetts office. Although a proposed sublease was discussed, Star and TAP agreed instead to an assignment of TAP's interest in the ground lease. Star gave Pelletier a check for $6,000 in exchange for a promissory note signed by TAP and Pelletier. The trial court found that Madfis and Pelletier discussed the provisions of the assignment at this meeting, but, in the course of negotiation, were not making identical interlineations on their respective copies. Madfis made changes in his own handwriting on two copies of the basic lease, although he testified that he had made changes on only one copy.

The court also found that Madfis materially altered a clause in the assignment that would void the assignment if TAP either paid the promissory note or completed construction of a store for Star. He converted the alternative termination conditions to conjunctive conditions, obligating TAP to complete a store for Star to secure release of the assignment, although a valid lease between Star and TAP, as recited in the assignment, never existed. Madfis accomplished the alteration after Pelletier and he had signed the assignment, without initialing the change or securing Pelletier's knowledge or approval. The court determined that Pelletier, who was experienced in real estate transactions, would not have agreed to such an alteration.

Madfis then recorded the assignment of lease in the Hillsborough County Registry of Deeds. The court determined that the recording of this knowingly and fraudulently altered assignment placed an encumbrance on the title of TAP, such conduct being an intentional interference with the contractual relationships of Wilko, Cathay and TAP. Additionally, the court found that in striking out the "assent" portion of the assignment, which the owners had to sign to validate the assignment, Madfis knew that he was recording a document that failed in its purported purpose—to give Star a valid assignment.

TAP attempted to secure a release of the assignment from Star by a written tender of $6,000 through its counsel. The court found

that this tender was legal and effective and that Star's refusal to accept payment constituted an intentional interference with the contractual relationships of Wilko, Cathay, and TAP.

The court ordered TAP to comply with the terms of its lease with Wilko, to credit Wilko with $320.84 on its future rental payments and to give additional credit on rents due for the $2,500 deposit. TAP was also ordered to pay Cathay $19,200.00, the amount received in prepaid rent. Star was ordered to pay to Wilko the following damages: $186,666.67 for lost profits from April 10, 1972, to October 31, 1973; $40,833.31 for lost profits from November 1, 1973, to June 1, 1974; $500 for a deposit to Image Buildings; and attorneys' fees in connection with the litigation. TAP was to receive from Star $22,807.14 for losses at the Broad Street Plaza from July 1972 through December 1973, $623 for expenses of rubbish removal, $8,682 for interest at 6% on loans, and attorneys' fees. Star's counterclaim against TAP for $6,000 was granted. Finally, Star was ordered to pay Cathay $50,000 for lost profits, $5,000 for an additional deposit, $1,500 for attorneys' fees in connection with negotiating the proposed lease, and attorneys' fees in connection with the litigation. We sustain all rulings of the trial court with the exception of its award of interest at the rate of six percent on the damages suffered by TAP on loans. The prevailing rate of interest of TAP's notes was eight and one-half percent; the amount awarded should be $12,400. Additionally, we sustain Wilko's exception to the trial court's granting of Star's motion for post-trial discovery.

■■■ Star argues that the court's determination that Star was guilty of fraud and illegal interference with the contracts of TAP, Wilko, and Cathay was incorrect as a matter of law, because the change in the language of the assignment was not material. Madfis admitted that the change in language would have required TAP to build a store for Star and pay $6,000, rather than simply to pay the money, to void the assignment. Although general terms of a contract may be limited by words that state the views and objectives of the parties, *Colebrook Water Company v. Parsons,* 88 N.H. 217, 186 A. 14 (1936) (per curiam); *Woods v. Nashua Mfg. Co.,* 5 N.H. 467, 473 (1831), when two clear, unambiguous, alternative clauses conflict, earlier general introductory language does not control. *Kogod v. Stanley Co.,* 186 F.2d 763, 765 (D.C. Cir. 1950); *Williams v. Barkley,* 165 N.Y. 48, 57, 58 N.E. 765, 767 (1900); *Thomas v. Dancer,* 264 P.2d 714, 717–18 (Okla. 1953). Madfis'

unilateral alteration of an executed document, which changed alternative termination clauses to conjunctive termination clauses, was clearly material. A "physical alteration of the terms of a written contract is material with respect to a party thereto if his rights or other legal relations with the party making the alteration . . . would, under such a contract as the altered one, be different from those created by the contract before the alteration." 6 A Corbin, Contracts § 1317, at 301 (1962).

■■ Star further argues that its recording of the altered document was proper, because it had a legally enforceable interest in the property. However, all parties agreed that Star never reached a binding lease agreement or other contract with TAP. Star recorded the altered assignment knowing that the original ground lessors had not consented to the assignment, that no lease had been entered into between TAP and Star, and that the recorded document constituted an encumbrance on TAP's title. Star knew that Wilko and Cathay had prior recorded leases with TAP, and that the recording of the altered assignment would make TAP's borrowing money to satisfy its leases with Wilko and Cathay difficult.

The court found that Madfis' conduct on behalf of Star constituted an intentional interference with the contractual rights of TAP, Wilko, and Cathay. Star had the burden of proof to show its privilege to justify the recording of the altered assignment. *Morra v. Hill*, 103 N.H. 492, 494, 175 A.2d 824, 826 (1961). The court's finding that Star never acquired an option to lease the premises from TAP was amply supported by the evidence. Furthermore, the court was free to disbelieve any evidence tending to show a privileged occasion. *Id.* at 494, 175 A.2d at 826.

■ Star was unable to establish a justification for its recording of the altered document, and thus was protecting no right or privilege by its recording. *See Russell v. Croteau*, 98 N.H. 68, 70, 94 A.2d 376, 377–78 (1953). The trial court specifically found that Star's actions were intentional and malicious. There is considerable evidence supporting this finding in the record. Star's recording of the altered assignment constituted a slander of title motivated by malice. "Malice, within the meaning of this rule, is an intention to vex, injure, or annoy. As a basis for the recovery of actual damages . . . it means only that the act is deliberate conduct . . . ." 50 Am. Jur. 2d *Libel and Slander* § 544, at 1063 (1970). The question

of malice was for the trier of fact. *Frankfort Oil Co. v. Snakard,* 279 F.2d 436, 443 (10th Cir.), *cert. denied,* 364 U.S. 920 (1960).

■■ Star contends that the court incorrectly implied fraud from the circumstances without clear and convincing proof. "Fraud is never to be presumed, but must be established by clear and convincing proof (*Lampesis v. Comolli,* 101 N.H. 279) and the circumstances must indicate with reasonable clarity that fraud was practiced." *Hoyt v. Horst,* 105 N.H. 380, 390, 201 A.2d 118, 125 (1964). Fraud cannot be implied from doubtful circumstances. *Sheris v. Thompson,* 111 N.H. 328, 331–32, 295 A.2d 268, 271 (1971). The court considered various factors in reaching its finding of fraud, including Madfis' material alteration of the assignment without Pelletier's knowledge or approval and his failure to initial those changes and check that all copies of the document conformed. Doubt was cast on the testimony of Madfis on various subjects, particularly his statements concerning the contents and location of his files of the case and his statements concerning Star's change of attorneys. The latter testimony was questionable in view of Attorney LaTourette's letter to Madfis explaining his unwillingness to file an action on behalf of Star, which stated in part that there was "a fraud problem in that Pelletier will contend that the recorded assignment of ground lease was materially changed without his knowledge or consent, and was not in fact the document which he signed . . . ." Letter from Donald S. LaTourette to Laurence J. Madfis (August 2, 1972), Exhibit No. 39. A consideration of the circumstances amply supports the trial court's conclusion that Star's action was fraudulent.

Star contends that there was no evidence to show that its actions proximately caused damage to the claimants. The trial court specifically found that the act of recording the fraudulently altered assignment placed a cloud on TAP's title, thus interfering with TAP's obligations to Wilko and Cathay by destroying the marketability of TAP's title and TAP's ability to procure bank loans. This finding was based upon testimony heard at trial, including an admission by Madfis that the recorded assignment constituted an encumbrance on TAP's title. Star caused the damages of Wilko and Cathay by intentionally interfering with their contractual rights.

■ Star also excepts to the damages awarded by the court to the claimants, asserting that they were speculative. Wilko and Cathay were awarded lost profits, lost deposits, and attorneys' fees.

Any undertaking to establish the amount of future gains prevented is likely to encounter difficulty in satisfying the requirement of reasonable certainty of proof. An established business can usually provide data from which future prospects can reasonably be projected. Where operations have never commenced, evidence of expected profits has generally been considered incompetent because speculative.

*Van Hooijdonk v. Langley*, 111 N.H. 32, 34, 274 A.2d 798, 799–800 (1971) (citations omitted). In *Van Hooijdonk*, evidence based on business operations of approximately two months was deemed competent. The lost profits of Wilko and Cathay were not merely speculative; Wilko's estimation of lost profits was based on the business records of a locally based outlet of a nationally franchised restaurant, Kentucky Fried Chicken. Mr. Wilson, who testified as to profits, had expertise in the management, sale, and evaluation of these franchises. Mr. Chin owned another Chinese restaurant in Nashua; the testimony of an experienced restaurant owner operating successfully within the same town is as convincing as the testimony permitted in *Van Hooijdonk*. "The real issue with respect to the testimony of the witness was not whether he was qualified as an expert, but whether there was sufficient relevant data so that his opinion as to future profits could serve to aid in resolving uncertainties." *Id.* at 34, 274 A.2d at 799. Cathay and Wilko presented sufficient data concerning lost profits to uphold the court's award of damages.

■ The trial court's full award of damages for lost profits is particularly suitable in view of Star's conduct. Star not only altered the assignment of lease and recorded it, thus interfering with claimants' contract rights, but refused to withdraw the fraudulent assignment. TAP, through its attorney, twice offered Star a check for $6,000 to pay its note. Star refused to accept the offer, which the trial court correctly found was a lawful tender. *See Lancaster Dev. Corp. v. Kattar*, 110 N.H. 163, 166–167, 262 A.2d 278, 280 (1970) (per curiam); *Sargent v. Graham*, 5 N.H. 440 (1831). The actions of Star justified the court's granting the claimants the full extent of their damages. "[N]o damages other than compensatory damages are to be awarded. However, when the act involved is wanton, malicious, or oppressive, the compensatory damages awarded may reflect the aggravating circumstances."

*Vratsenes v. N.H. Auto, Inc.,* 112 N.H. 71, 73, 289 A.2d 66, 68 (1972).

■ After trial, the court granted Star's motion for discovery of financial data pertaining to Wilko's profit and loss statements covering the operation of the Kentucky Fried Chicken outlet at Simoneau Plaza in Nashua from December 18, 1973, to June 1, 1974. The court's original award of prospective damages for that period was based upon substantial expert evidence presented by Wilko. Star offered no contradictory evidence, although it had ample opportunity to do so. Wilko is entitled to one recovery for all injuries caused by Star's wrongful acts. *Holyoke v. Railway,* 48 N.H. 541, 545 (1869). Star's motion is in effect a motion for a new trial. *See Magoon v. New Eng. Power Co.,* 103 N.H. 366, 367, 172 A.2d 366, 367 (1961). "These matters were or could have been explored at the trial itself. The present motion is simply a continuation of the same dispute which the original trial was supposed to resolve." *Bricker v. Sceva Speare Hosp.,* 115 N.H. 709, 711, 350 A.2d 623, 625 (1975). Discovery of the information after trial would only produce material on which motions to reopen and reconsider damages could be based. In view of Star's conduct and because Star could have presented evidence as to prospective damages but chose not to do so, its motion for discovery should have been denied.

The trial court, in its supplementary decree, stated that there was inadequate information as to the interest rate on TAP's loans, and therefore awarded the legal rate of six percent per annum. TAP's exhibit 64 shows that the interest rate on its loans was eight and one-half percent. The amount awarded for interest should be $12,400.

■ Star objects to the trial court's granting of claimants' attorneys' fees, to be established by the court if the parties cannot agree. Star argues that there can be no recovery of counsel fees in the absence of statutory authorization or some established exception. *Utica Mutual Ins. Co. v. Plante,* 106 N.H. 525, 526, 214 A.2d 742, 743 (1965). Counsel fees other than those authorized by statute have been allowed under certain classifications. *Guay v. Association,* 87 N.H. 216, 221–22, 177 A. 409, 413 (1935). "Plainly the foundation for the historic practice of granting reimbursement for the costs of litigation . . . is part of the original authority of the chancellor to do equity in a particular situation." *Sprague v. Ti-*

*conic Nat'l Bank,* 307 U.S. 161, 166 (1939). Star's conduct was found to be malicious, fraudulent, and intentional; the award of attorneys' fees lay within the court's power. The exceptions established by the judiciary are flexible rather than absolute. *See generally* Doleac, *Court Awarded Fees Under New Hampshire Common Law,* 17 N.H.B.J. 134 (1976).

This court has specifically held that a "court, in the exercise of its general equitable powers, can order a party who has instituted or prolonged litigation through bad faith or obstinate, unjust, vexatious, wanton, or oppressive conduct, to pay his opponent's counsel fees." *Harkeem v. Adams,* 117 N.H. 687, 377 A.2d 617 (1977). Star's actions were determined by the trial court to be fraudulent and intentional. They were continued despite notice given by the claimants of their damages and Star's own legal counsel's statement of the weakness of its case. Star left the fraudulently altered assignment on the record after two tender offers from TAP. The trial court's award of attorney fees on the unique facts of this case was correct under *Harkeem* and consistent with our policy of awarding increased compensatory damages when the acts complained of were wanton, malicious, or oppressive. *Vratsenes v. N.H. Auto, Inc.,* 112 N.H. at 72, 73, 289 A.2d at 67–68. This opinion should not be read as changing New Hampshire's traditional rule limiting attorney's fees except as provided by statute or under certain special circumstances.

The matter of Attorney Madfis' conduct in this case under the ABA Code of Professional Responsibility DR 7-102 (A) (Final Draft, 1969) is not before us, but may be one for consideration by the Board of Bar Overseers of Massachusetts. *See Stephenson v. Stephenson,* 111 N.H. 189, 196, 278 A.2d 351, 356 (1971).

*Exceptions overruled in part;*
*sustained in part.*

All concurred.