**Leslie EMERY, Plaintiff, Appellant,**

v.

**MERRIMACK VALLEY WOOD PRODUCTS, INC., et al., Defendants, Appellees.**

**No. 82–1597.**

United States Court of Appeals, First Circuit.

Argued Jan. 4, 1983.

Decided March 2, 1983.

As Modified on Denial of Rehearing March 28, 1983.

---

(4) made—

Mark S. Gearreald, Exeter, N.H., with whom Shute, Engel & Morse, P.A., Exeter, N.H., was on brief, for plaintiff, appellant.

Robert W. Pillsbury, Nashua, N.H., with whom Winer, Pillsbury & Bennett, Nashua, N.H., was on brief, for defendants, appellees.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, and PETTINE,* Senior District Judge.

BOWNES, Circuit Judge.

Plaintiff-appellant Leslie Emery brought this diversity action against his former employers, Merrimack Valley Wood Products, Inc., and American Cabinet Corp. (jointly referred to as "Merrimack"), alleging tortious interference with his contractual relationship with Building Material Distributors (BMD). The United States District Court for the District of New Hampshire granted Merrimack's motion for summary judgment. In determining whether summary judgment is appropriate, we must "look at the record ... in the light most favorable to ... the party opposing the motion," *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), indulging in all inferences favorable to this party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Santoni v. Federal Deposit Insurance Corp.,* 677 F.2d 174, 177 (1st Cir.1982); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). Reversal of a grant of summary judgment is required when issues of fact which were adequately raised before the district court need to be resolved before the legal issues in the case may be decided. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Over The Road Drivers, Inc. v. Transport Insurance Co.,* 637 F.2d 816, 818 (1st Cir.1980). Because we find that this case contains "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), we affirm.

---

* Of the District of Rhode Island, sitting by designation.

Emery was hired by Merrimack to sell cabinets and millwork on May 9, 1977. Three days later, he signed a comprehensive Employment Agreement, containing the following restrictive covenant which gave rise to this litigation.

10. The Salesman agrees not to be or become engaged in any competing company or industry during the term of this Agreement, except with the written consent of the Employer. If for any reason his employment or relations with the Employer shall be terminated, then he shall not, through employment with any competitive concern or industry sell to directly or indirectly, or cause to be sold, any materials to customers which the Employer has sold to within the twelve (12) months prior [to] the date of termination, for a period of one (1) year from the date of termination.

According to James V. Derderian, vice-president of Merrimack Valley Wood Products and president of American Cabinet Corp., this covenant was required only of those employees, like Emery, who required training in Merrimack's product line. The Agreement could be terminated by either party upon fourteen days written notice, and was to be governed and construed in accordance with Massachusetts law.

After two years with Merrimack, Emery was terminated because of his unsatisfactory sales performance. Within a few months of his termination, Emery was hired by BMD a division of Woodmaster, Inc. BMD, like Merrimack, sold millwork in New Hampshire, and was thus in competition with Merrimack. Emery was initially compensated at the rate of $175 per week, but plans were being developed whereby Emery would manage an expanded millwork division of BMD, and be paid a yearly salary of approximately $20,000.

Shortly after starting work with BMD, Emery met by chance Everett Shea, foreman of Chauncy Construction, at a Friendly's restaurant. Emery told Shea that he could not sell millwork to Chauncy Construction because this firm was a customer of Merrimack. Shea, however, indicated that he had not bought from Merrimack for a few months, that he was feuding with Merrimack over certain items, and that if Emery would not sell to him, Shea would buy from Diamond Lumber, another competitor of Merrimack. Emery then sold millwork, totalling approximately $4,000 to Chauncy Construction. Another customer of Merrimack, Art Vickers of A & F Construction, called Emery, not knowing that he was employed by BMD. Vickers indicated that A & F could no longer buy millwork from Merrimack because of credit problems. Emery attempted to have one of A & F's owners call Merrimack's credit manager, but eventually sold about $8,000 worth of BMD millwork to A & F.

During September and October of 1979, Derderian received information from one of Merrimack's sales representatives, Steven Bogosian, that there had been contact between Emery and certain customers of Merrimack whom Emery had serviced while employed by Merrimack. Derderian consulted with Merrimack's counsel, John A. James, Jr., who on October 23, 1979, sent a letter (the "James" letter) to the President of BMD's parent company. This letter stated in pertinent part:

It has come to our attention that you have employed one Leslie R. Emery of Freemont, New Hampshire as a salesman. It has also come to our attention that Mr. Emery has been contacting and selling building products to customers of my clients.

Mr. Emery is presently under an employment agreement which prohibits him from soliciting business from customers of Merrimack Valley Wood Products, Inc. and American Cabinet Corporation for one year after the date of the termination of his employment.

You are hereby advised that it is my present intention to take all necessary stemps [sic] to prevent your intentional interference with the contractual relationship between Mr. Emery and my clients.

Please have your representative call me as soon as possible.

**988**

Upon receiving this letter, BMD gave Emery two weeks to try to resolve his problem, and suggested contacting Merrimack. Emery called Derderian, asking if some arrangement could be made so that Emery could return to work with BMD. According to Emery, Derderian responded, "No, that's tough. You signed the contract, and that's got to be the way."[1] Emery then contacted Attorney James, who said that he would contact Derderian. Emery again contacted Derderian and was told that James had not spoken with Derderian and that "things would definitely not change." Because Emery had not been able to come to an agreement with Merrimack, BMD terminated Emery, informing him, however, that "[a]s soon as you clarify it [the effect of the covenant not to compete], call us and we will resume where we left off, but until then we can't do anything."[2]

Emery filed a diversity action in April 1980, alleging that Merrimack had intentionally and maliciously interfered with his existing and prospective contractual relations. Such a tort action is recognized in New Hampshire,[3] with the courts adopting the view set forth in the Restatement (Second) of Torts § 766 (1977). *Montrone v. Maxfield,* 449 A.2d 1216, 1217 (N.H. 1982); *Baker v. Dennis Brown Realty, Inc.,* 121 N.H. 640, 433 A.2d 1271, 1273–74 (N.H. 1981); *Hangar One, Inc. v. Davis Associates, Inc.,* 121 N.H. 586, 431 A.2d 792, 794 (N.H.1981); *Bricker v. Crane,* 118 N.H. 249, 387 A.2d 321, 323 (N.H.1978); *Griswold v. Heat, Inc.,* 108 N.H. 119, 229 A.2d 183, 187 (N.H.1967); *Russell v. Croteau,* 98 N.H. 68, 94 A.2d 376, 377 (N.H.1953). To prove a tortious interference, a plaintiff must show that (1) the plaintiff had an economic rela-

tionship with a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally and improperly interfered with this relationship; and (4) the plaintiff was damaged by such interference. It is clear that Merrimack intentionally interfered with Emery's relationship with BMD. The issue is whether such interference was proper. Or, to put it another way, whether Merrimack's action in sending the James letter was either privileged or otherwise justified under the circumstances. *Baker v. Dennis Brown Realty, Inc.,* 433 A.2d at 1274; *Bricker v. Crane,* 387 A.2d at 323; *Wilko of Nashua, Inc. v. TAP Realty, Inc.,* 117 N.H. 843, 379 A.2d 798, 801–02 (N.H.1977); *Morra v. Hill,* 103 N.H. 492, 175 A.2d 824, 826 (N.H.1961); *Huskie v. Griffin,* 75 N.H. 345, 74 A. 595, 596 (N.H.1909). The Restatement (Second) of Torts § 767, *supra,* sets out a number of factors which must be considered in determining whether an intentional interference is also improper. The Restatement also contains specific provisions which deal with narrow situations in which the application of the § 767 factors has produced more clearly articulated standards. Applicable here is § 773 which provides:

One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

---

1. Derderian, in a deposition, stated that he had had no contact with Emery after his termination with Merrimack. For purposes of the motion for summary judgment, however, Merrimack has agreed that the conversations occurred as Emery reported them.

2. Robert A. Cormier, Sr., vice-president and chief executive officer of BMD, also indicated that "if Les Emery came back to us today and asked to come back to work for us I think sincerely we'd take him back.... [Even one

year ago there] would have been room for Les as far as I am concerned because of his knowledge of the product. Providing there would be no legal problems between companies, he would have been more than welcome back."

3. Under the significant contacts/governmental interest test enunciated in *Clark v. Clark,* 107 N.H. 351, 222 A.2d 205, 207–10 (1966), this diversity action is governed by New Hampshire's tort law.

To prevail on this affirmative defense, a defendant must prove that (1) it has a legally protected interest; (2) it made a good faith threat to protect this interest; and (3) it acted by appropriate means. *Id.* comment a. If these three criteria are satisfied, an intentional interference will be permissible. We proceed to analyze Merrimack's action in light of these three factors.

## I. Legally Protected Interest

Merrimack asserts that the covenant not to compete contained in the Employment Agreement which Emery signed constitutes a legally protected interest sufficient for § 773 purposes. Under New Hampshire law,[4] covenants not to compete, while "not favorably regarded," *Laconia Clinic v. Cullen,* 119 N.H. 804, 408 A.2d 412, 414 (N.H. 1979), are nonetheless enforceable in certain situations. The New Hampshire Supreme Court, in *Moore v. Dover Veterinary Hospital, Inc.,* 116 N.H. 680, 367 A.2d 1044 (N.H. 1976), established a three-part test for evaluating the validity of covenants not to compete:

> Notwithstanding the factual diversity of the cases, ... the "authorities ... 'boil down' to the general proposition that '[t]he conclusion reached ... is that the validity of the agreement depends upon the reasonableness of the restraint as applied to the particular circumstances of each case.'" ... [A] restraint on employment is reasonable only if it is no greater than necessary for the protection of the employer's legitimate interest, does not impose undue hardship on the employee, and is not injurious to the public interest.

*Id.* 367 A.2d at 1047 (citations omitted) (5-year restriction on practicing veterinary medicine within 20 miles of defendant's hospital is reasonable). *See also Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 406 A.2d 1310, 1312–13 (N.H.1979) (3-year restriction on contacting any customer, past or present, of the largest accounting firm in New Hampshire and Vermont is unreasonably broad); *Dunfey Realty Co., Inc. v. Enwright,* 101 N.H. 195, 138 A.2d 80, 82 (N.H. 1958) (3-year restriction on selling life insurance or real estate in 2 counties is reasonable).

The covenant at issue here easily satisfies the *Moore* three-part test. Merrimack had a legitimate interest in assuring that Emery, who had received training from Merrimack, would not immediately use this training to Merrimack's detriment. As part of his training, Emery was introduced to Merrimack's customers. Obviously, Merrimack was justified in wanting to protect the goodwill which it had fostered with these customers. The restriction was very narrowly limited in time (one year) and scope. Rather than defining a geographic area, the covenant was limited only to those customers to whom Merrimack had sold in the year

---

**4.** This case presents a subtle choice of law problem, which neither party has addressed. The Employment Agreement specifies that it is to be construed in accordance with Massachusetts law. In general, the parties' specification of the governing law in a contract will control, so long as the contract has a reasonable relation to the jurisdiction whose law is chosen. Restatement (Second) of Conflict of Laws § 186 (1969). Here, such a reasonable relationship is evident, since Merrimack is a Massachusetts corporation, with sales in Massachusetts and southern New Hampshire. Massachusetts law, however, will not be applied, if to do so would violate some fundamental policy of New Hampshire, a state which has a materially greater interest in the subject matter of the contract, and the state whose law would apply if not for the contract's specification of Massachusetts law. *Id.; Southern International Sales Co., Inc. v. Potter & Brumfield Division of AMF Inc.,* 410 F.Supp. 1339, 1341–43 (S.D.N.Y. 1976); *Theatre Time Clock, Inc. v. Stewart,* 276 F.Supp. 593, 596–98 (E.D.La.1967); *Forney Industries, Inc. v. Andre,* 246 F.Supp. 333, 334 (D.N.D.1965).

We need not resolve this choice of law question, because although Merrimack originally suggested that Massachusetts law should apply, this position was not pressed in the district court, and before us both parties have relied exclusively on New Hampshire law. Moreover, our examination of Massachusetts law convinces us that its application would not require a different result. *See, e.g., Blackwell v. E.M. Helides, Jr., Inc.,* 368 Mass. 225, 331 N.E.2d 54 (Mass.1975); *Marine Contractors Co., Inc. v. Hurley,* 365 Mass. 280, 310 N.E.2d 915 (Mass. 1974); *All Stainless, Inc. v. Colby,* 364 Mass. 773, 308 N.E.2d 481 (Mass.1974). We therefore apply New Hampshire law.

preceding Emery's termination. Because of the narrowness of the restriction, Emery was not precluded from pursuing his chosen career as a millwork sales representative. Even without changing the territory in which he formerly sold millwork, Emery was free to contact any homeowner, contractor or construction company who had not placed an order with Merrimack in the preceding year. The record gives no indication that Merrimack was the sole, or even leading millwork outfit in southern New Hampshire. Rather, the evidence points to the opposite conclusion. Both Emery and Cormier alleged that BMD was seeking to expand its millwork operation. And the record refers to yet another competitor, Diamond Lumber. Thus it appears that the public was still left with a choice of suppliers for its millwork needs. We have no doubt that the New Hampshire state courts would find this covenant reasonable.

■ Emery argues that the covenant was unreasonably broad as applied to the two former customers of Merrimack to whom Emery actually sold millwork. According to Emery, the covenant cannot be held to apply to former customers who are no longer dealing with Merrimack for reasons entirely independent of Emery. Emery correctly points out that there is not an exact fit between the prohibited class under the covenant and those customers with respect to whom Merrimack requires protection. But the law does not require a perfect fit. An entire covenant not to compete is not invalidated simply because a former employee can find one or two instances where the covenant is broader than the absolutely minimum protection required by the employer. The employer is not required to draft a covenant which covers every contingency; all that is required is "reasonableness given the particular circumstances." *Smith, Batchelder & Rugg v. Foster,* 406 A.2d at 1312. To adopt Emery's position would encourage collusion between former customers and former employees. The courts would necessarily become entangled in deciding which former customers could truly be classified as no longer interested in dealing with the former employer. We

therefore do not change our determination that the covenant at issue was reasonable both in general, and as applied to the facts of Emery's situation.

Emery next alleges that the covenant, even if reasonable, was not enforceable because of Merrimack's prior breach of the Employment Agreement. *See Laconia Clinic v. Cullen,* 408 A.2d at 414. In particular, Emery alleges that he was not given the two-week written notice required by the contract, and that he was not paid between $300 and $400 of commissions due him. Merrimack squarely controverts both of these contentions. On the basis of these factual disagreements, Emery contends that the grant of summary judgment was inappropriate.

The First Circuit's standard for granting summary judgment was set forth in the seminal case of *Hahn v. Sargent,* 523 F.2d at 464, where we stated:

> [I]t is the function of summary judgment, in the time hallowed phrase, "to pierce formal allegations of facts in the pleadings . . .", *Schreffler v. Bowles,* 153 F.2d 1, 3 (10th Cir.1946), and to determine whether further exploration of the facts is necessary.

The language of Rule 56(c) sets forth a bifurcated standard which the party opposing summary judgment must meet to defeat the motion. He must establish the existence of an issue of fact which is both "genuine" and "material". A material issue is one which affects the outcome of the litigation. To be considered "genuine" for Rule 56 purposes a material issue must be established by "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Service Co., Inc.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). The evidence manifesting the dispute must be "substantial", going beyond the allegations of the complaint.

(Citations omitted). *See also Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 486 (1st Cir.1981); *Thyssen Plastik Anger KG v. Induplas, Inc.,* 576 F.2d 400, 401 (1st Cir.1978). Merrimack, as the party moving for summary judgment, has the burden of affirmatively showing that there is no genuine issue of fact as to every relevant issue raised by the pleadings. *Mack v. Cape Elizabeth School Board,* 553 F.2d 720, 722 (1st Cir.1977). *Hahn,* however, makes it clear that Emery, the opposing party, cannot defeat the summary judgment motion merely by standing on his bare allegations, especially where wholly contradicted by the affidavits. *Santoni v. Federal Deposit Insurance Corp.,* 677 F.2d at 179. Rather, Emery must be able "to point to specific facts that were properly asserted in [his] affidavits and supporting materials which, if established at trial, would entitle [him] to prevail on these matters." *Over The Road Drivers, Inc. v. Transport Insurance Co.,* 637 F.2d at 818.

■ On the basis of the record before us, we cannot say that Emery's claim for certain commissions is totally nonmeritorious. This dispute over commissions, however, does not rise to the level of a genuine issue as to a *material* fact in this tort action. Derderian, at a deposition, explained the complicated commission structure used to compensate Merrimack's sales representatives. With regard to Emery, Derderian stated that in the month of May, Emery had accrued a commission of $254.51. In June and July, however, Emery's sales fell below the level where he could accrue commissions, therefore, his May commission was held up. When Emery was terminated, the average sales of his last three months (May-July) did not entitle him to any commission; the slow sales in June and July had cancelled out the $254.51 accrued, but not due, in May. Emery, however, maintained that "I never received any monies from defendants for the bonuses I had earned from my last weeks of sales in their employ." Even were we to decide that Emery was entitled to unpaid commissions, such a breach of the Employment Agreement would be, at most, a de minimis violation. Such a minor violation, while perhaps giving rise to a contract action, would not preclude Merrimack from enforcing the remaining provisions of the Employment Agreement.[5] *Cf. Laconia Clinic v. Cullen,* 408 A.2d at 414 (employer's breach of employment agreement "so material" as to discharge former employee's legal duty under a covenant not to compete).

■ Similarly, Emery's claim that he did not receive the two-week notice specified in the Employment Agreement does not render the grant of summary judgment for Merrimack inappropriate. Merrimack produced a copy of a termination letter dated July 12, 1979, informing Emery of his termination effective July 29, 1979.[6] Emery does not allege that he did not receive this letter. Rather, in a conclusory affidavit, Emery avers that "I never received any written notice of termination prior to being terminated as an employee of defendants.... I was only informed of my termination orally when called into the office on the date I left defendants' employ ...." Emery's argument appears to be that the oral notice of termination, given prior to his

---

**5.** The Restatement (Second) of Torts § 773, *supra*, speaks of a "legally protected interest." While not explicit, the provision appears to encompass a defendant's *good faith belief* that it has such an interest, even if, in fact, the interest is defective. The Restatement contains the following illustration:

A enters into a contract to buy Blackacre from B. C *honestly believes* that he has a right of way over Blackacre. With knowledge of the contract, C in good faith informs A of his interest and threatens to enforce it by legal proceedings if, as and when the owner of Blackacre should deny his claim. A

thereupon refuses to perform his contract with B. C's interference is not improper under the rule stated in this Section.

*Id.* comment a, illustration 1 (emphasis added). Even if Merrimack breached the Employment Agreement to a minor extent, it might still in good faith believe that it possessed a legally protected interest.

**6.** The entire text of the letter reads: "This letter serves as confirmation of our decision to terminate you as sales representative for Merrimack Valley Wood Products and American Cabinet Corporation effective July 29, 1979."

receipt of the letter, coupled with his decision not to return to work for the remaining two weeks of his employment, constituted a violation of the Employment Agreement's notice provision. Although we find this argument lacks merit, we will nonetheless assume that Merrimack breached the Employment Agreement. Such a breach, in the context of this case, would not be material, and Emery has not averred that the lack of written notice prejudiced him in any way. As we indicated above, such a minor violation of the Employment Agreement would not preclude Merrimack from enforcing the covenant not to compete.

## II. *Good Faith Assertion of a Legally Protected Interest*

Emery maintains that Merrimack acted with malicious motives in sending the James letter to BMD. To prevail on this issue, Merrimack must demonstrate its good faith. Issues of intent are particularly difficult to resolve on a motion for summary judgment. As we stated in *Hahn v. Sargent:*

> State of mind is difficult to `prove and great circumspection is required where summary judgment is sought on an issue involving state of mind. *Poller v. CBS,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). But that does not mean that a party against whom summary judgment is sought is entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element. There must be some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim. *Washington Post Co. v. Keogh,* 125 U.S.App.D.C. 32, 365 F.2d 965 (1966).

523 F.2d at 468, *quoted with approval in White v. Hearst Corp.,* 669 F.2d 14, 17 (1st Cir.1982); *Maiorana v. MacDonald,* 596 F.2d 1072, 1076–77 (1st Cir.1979); *Gual Morales v. Hernandez Vega,* 579 F.2d 677, 680–81 (1st Cir.1978).

As evidence of Merrimack's malicious motive, Emery points to the alleged telephone conversations between himself and Derderian in which Derderian insisted upon enforcing the covenant. Since, as we have found, Merrimack had the legally protected right to enforce the covenant, no dishonorable motive may be inferred from Merrimack's resolution to enforce this right. Similarly, Attorney James' failure to contact Derderian gives rise to no inference of bad faith. Emery further alleges that the James letter was sent based only on suspicion and hearsay. According to Emery, Merrimack's only source of information with regard to Emery's contact with former customers was provided by a Merrimack sales representative, Steven Bogosian, son of the office manager and the person who took over Emery's position at Merrimack. Derderian, upon receiving Bogosian's information, conducted no further investigation into Emery's conduct, but instead immediately contacted Merrimack's attorney. We reiterate again that Merrimack had the legally protected right to enforce the covenant, and the sending of the James letter was a reasonable first step in protecting its interests.

The mere fact that the James letter did not call for Emery's discharge is not dispositive of the issue of intent. The language and tone of the letter, however, evidence the good faith nature of Merrimack's action. While Emery is entitled to all favorable inferences, he is not entitled "to build a case on the gossamer threads of whimsy, speculation and conjecture." *Manganaro v. Delaval Separator Co.,* 309 F.2d 389, 393 (1st Cir.1962). Emery has done nothing more than make conclusory allegations, unsupported by factual data, and thus has not demonstrated that Merrimack's motive in sending the James letter presents a triable issue of fact.

## III. *Appropriate Means*

The James letter, advising BMD of Merrimack's intention to take all necessary steps is undeniably appropriate. The restrained language used by James is in full accord with the standards set out in Restatement (Second) of Torts § 767 comment c, *supra.* We refuse to engage in Emery's baseless conjecture that "necessary steps" could in-

clude such nonlegal actions as threats of personal violence.

We find that Merrimack's action in sending the James letter to BMD was justified as a matter of law. All factual disputes alleged by Emery are illusory.

*Affirmed.*