Bonczar v. Suburban Propane, et al.   CV-94-68-B    09/30/96

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Michael Bonczar and
Jo-Ann Bonczar

    v.                                      CV-94-68-B

Suburban Propane Gas Corporation,
David Feheley, Carl Richardson,
Dennis Spina, and Glen Stec


# O R D E R

Michael Bonczar brought suit against his employer, Suburban Propane Gas Corporation ("Suburban"), and his supervisors after he was demoted.  His complaint alleges (1) age discrimination, wrongful termination, and intentional infliction of emotional distress against all defendants; (2) defamation against defendants Suburban, Spina, Richardson, and Stec; (3) intentional interference with contractual relations against defendant Feheley; and (4) breach of contract and breach of the implied covenant of good faith and fair dealing against defendant Suburban.  In addition, Jo-Ann Bonczar asserts a claim for loss of consortium against all defendants.

The defendants have moved for summary judgment on all claims. I grant summary judgment in favor of the individual defendants on all claims against them and in Suburban's favor on the claims for age discrimination, intentional infliction of emotional distress, and defamation. Bonczar's claims for wrongful discharge, breach of contract, and breach of the duty of good faith and fair dealing against Suburban, and part of Jo-Ann Bonczar's loss of consortium claim, survive as is explained below.

## I. STANDARD OF REVIEW

Summary judgment is appropriate if the record, taken in the light most favorable to the non-moving party, shows that no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Commercial Union Ins. Co. v. Walbrook Ins. Co., 7 F.3d 1047, 1050 (1st Cir. 1993). A "material fact" is one "that might affect the outcome of the suit under the governing law," and a genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Affidavits supporting or opposing a motion for summary judgment "[must] be made on personal knowledge, [must] set forth such facts as would be admissible in evidence, and [must] show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). The party opposing consideration of an affidavit must specify the objectionable portions and the grounds for objection. Casas Office Machs. v. Mita Copystar America, 42 F.3d 668, 682 (1st Cir. 1994). I may disregard only inadmissible portions of an affidavit. I state the background facts in accordance with the standard of review.

## II. BACKGROUND

Bonczar began working as a truck driver for defendant Suburban Propane in 1972, and then worked his way up to a regional manager position for Maine, New Hampshire, and Vermont by 1989. David Feheley, the area vice president, was his immediate supervisor. Feheley reported to Carl Richardson, a senior vice president, who reported to Dennis Spina, president of Suburban. Glen Stec was vice president of human resources.

One way in which Suburban's management attempted to evaluate the company's financial health was by examining changes in its

3

ratio of customer losses to customer gains (the "loss-to-gain ratio"). In February 1991, Feheley warned Bonczar and the other regional managers that he expected each region to improve its loss-to-gain ratio. Feheley followed up his warning with an April 1991 memorandum in which he instructed his regional managers:

> Please advise your district managers of our decision regarding the management of customer removals. A district is not to perform what would equate to a customer removal unless there is a corresponding installation to counteract the removal.

Bonczar and other regional managers interpreted this memorandum as an instruction to falsify reports when necessary in order to show an improving loss-to-gain ratio. As a result, Bonczar allowed his district managers to submit false reports.

In the fall of 1991, Walt Wojewodzic, the credit and collections manager for Bonczar's region, raised the issue of false reports with Spina during a meeting of credit and collections managers at Suburban's headquarters. This action prompted Feheley to order Bonczar to fire Wojewodzic. Bonczar refused to comply with Feheley's directive.

In February 1992, Bonczar held a series of meetings with his district managers to address the false reports issue. During these meetings, he informed his staff that he planned to meet

4

with Spina and request that Spina rescind Feheley's April 1991 directive.  However, before Bonczar could meet with Spina, Wojewodzic asked Spina to meet with all of the district managers to discuss Feheley's policy.  Spina held this meeting on February 19, 1992, but barred Bonczar from participating.

On February 24, 1992, Richardson called Bonczar and suspended him.  Bonczar began to suffer from extreme anxiety, including bouts of hyperventilation, for which he sought professional help.  Stec ordered Bonczar to attend a meeting on February 28 with him, Spina, and Richardson at the company headquarters in Whippany, New Jersey.  Bonczar was too upset to drive, so his wife drove him to the meeting.  It lasted about two and one-half hours.  Spina and Richardson criticized Bonczar harshly for, inter alia, lacking leadership, blaming problems on upper level management, falsifying reports, writing unprofessional memoranda,[1] and failing to complete required evaluations of his district managers.

Several days after the February 28 meeting, Richardson and Feheley informed Bonczar that he was no longer a regional

---

[1] In one memorandum to his district managers, Bonczar stated, "the only difference between a brown-noser and a shit-head is depth perception."  In another memorandum, he instructed his district managers to "cover thy posterior".

manager, but that he could continue to work for Suburban as a District Manager for the same pay. Bonczar refused their offer, and appealed through Suburban's Employee Appeal and Review System ("EARS"). Feheley considered and denied Bonczar's first appeal. Suburban never considered Bonczar's second appeal because Bonczar was unable to drive to New Jersey for another scheduled meeting. He never returned to work.

During the same time period, Feheley and Spina made several age-related comments. Feheley often bragged about having been the youngest regional manager, and suggested that he was proud of the general youth of his staff. At a meeting of the regional managers in 1991, he referred to Bonczar, who was then forty-six, and another manager as "old bucks." Spina told the district managers at the February 19, 1992, meeting that he disliked the "old" Suburban management style. Suburban filled Bonczar's regional position with a thirty-five year-old employee.

## III. DISCUSSION

### A. COUNT I: AGE DISCRIMINATION

Bonczar alleges that defendants discriminated against him on the basis of his age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C.A. § 621, et seq. (West 1985 &

6

Supp. 1995) ("ADEA"). Under the ADEA, a plaintiff may establish discrimination either by direct or by circumstantial evidence. Direct evidence must be the "evidentiary equivalent of a smoking gun," Smith v. F.W. Morse & Co., 76 F.3d 413, 421 (1st Cir. 1996), such that, if believed, it would establish discrimination without any inferences. Bodenheimer v. PPG Indus., 5 F.3d 955, 958 (5th Cir. 1993). If a plaintiff produces direct evidence that discrimination was a motivating factor in the adverse employment decision, the burden shifts to the defendant to prove that it would have made the same decision absent a discriminatory motive. Smith, 76 F.3d at 421; Jackson v. Harvard, 900 F.2d 464, 467 (1st Cir. 1990), cert. denied, 498 U.S. 848 (1990).[2]

When, as is frequently the case, a plaintiff is forced to rely on circumstantial evidence, the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) and most recently explained in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993), applies. Pages-Cahue v. Iberia

_____

[2] The Civil Rights Act of 1991 changed the law in Title VII cases to permit a plaintiff to recover declaratory relief, injunctive relief, costs, and attorneys' fees when the employee meets its burden of proof under Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) if discrimination nevertheless was a motivating factor in the employer's decision. See 42 U.S.C.A. § 2000e-2(a) (West 1994). However, this portion of the Civil Rights Act of 1991 does not apply to age discrimination claims. Thus, Price Waterhouse still applies to such claims.

7

Lineas Aereas de Espana, 82 F.3d 533, 537 (1st Cir. 1996); LeBlanc v. Great American Ins. Co, 6 F.3d 836, 842-43 (1st Cir. 1993), cert. denied, 114 S.Ct. 1398 (1994). The plaintiff must establish a prima facie case of discrimination by proving by a preponderance of the evidence that (1) he was a member of a protected class, (2) he performed his job adequately, (3) he was nevertheless dismissed/demoted and (4) his employer either replaced him with a younger person or otherwise did not treat age neutrally. See Hicks 509 U.S. at 506; Pages-Cahue, 82 F.3d at 533; Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091-92 (1st Cir. 1995). While the burden of persuasion remains with the plaintiff throughout the case, a presumption of discrimination arises from proof of his prima facie case. Hicks, 509 U.S. at 507. To rebut this presumption, the employer must produce evidence which, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." Id. at 509. If the employer meets its burden of production, the presumption of discrimination "drops out of the picture." Hicks, 509 U.S. at 511. Accord, Pages-Cahue, 82 F.3d at 536; Woodman, 51 F.3d at 1091; LeBlanc, 6 F.3d at 843.

Though Hicks recognizes that an employee always remains responsible for proving that her employer dismissed her because

8

of her age, it also provides in dicta that:

> The factfinder's disbelief of the reasons put forward
> by the defendant (particularly if disbelief is
> accompanied by a suspicion of mendacity) may, together
> with the elements of the prima facie case, suffice to
> show intentional discrimination. Thus, rejection of
> the defendant's proffered reasons, [sic] will permit
> the trier of fact to infer the ultimate fact of
> intentional discrimination.

509 U.S. at 511 (emphasis in original). At least one circuit interprets this dicta to entitle a plaintiff to submit her claim to the jury whenever she has proved her prima facie case and demonstrated that the employer's reason for its action was false. Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1123 (7th Cir. 1994). The First Circuit, however, has determined that proof of a prima facie case and evidence of pretext will suffice only if the factfinder could reasonably conclude from all of the evidence that the defendant intentionally discriminated against the plaintiff. See Barbour v. Dynamics Research Corp., 63 F.3d 32, 39 (1st Cir. 1995), cert. denied, 116 S.Ct. 914 (1996); Udo v. Tomes, 54 F.3d 9, 13 (1st Cir. 1995); Smith v. Stratus Computer, 40 F.3d 11, 16 (1st Cir. 1994), cert. denied, 115 S.Ct. 1958 (1995); Woods v. Friction Materials, 30 F.3d 255, 260-61 n.3 (1st Cir. 1994). In other words, proof of a prima facie case plus pretext will be enough to survive summary judgment in some but not all cases. See, e.g., Woods, 30 F.3d at 260-61 n.3. I apply

9

the First Circuit standard in evaluating Bonczar's claim.

Bonczar contends that he has produced sufficient direct evidence of discrimination to qualify his claim as a direct evidence case.  I disagree.  Bonczar supports his position with the following:  (1) Feheley once referred to Bonczar and another older employee as "old bucks" at a meeting of regional managers in 1991; (2) Feheley once boasted of the general youth of his staff, often bragged about being the youngest regional manager in Suburban, and once commented on his own relative youth around the time of his birthday; (3) Spina was rumored to be eager to do away with the "old" Suburban culture and employees; (4) when Spina learned that Richardson, another employee, planned to retire early, he told him that "he would F [Richardson] before [Richardson] F'd him," (abbreviation in original) and that he "didn't want people around him unless they were going to be there for ten years or longer"; and (5) Richardson believed that he was the victim of age discrimination because Spina fired him for requesting an early retirement plan.  While some of these statements and actions arguably evidence age consciousness by Bonczar's superior, they do not constitute direct evidence of Bonczar's claim that he was demoted because of his age.  As Justice O'Connor observed in her concurring opinion in Price

10

Waterhouse, "[S]tray remarks in the workplace, while perhaps probative of sexual harassment, . . . cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria.  Nor can statements by nondecision-makers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard."  Price Waterhouse, 490 U.S. at 277 (internal citations omitted).  Therefore, I will analyze his claim under the McDonell-Douglas framework.

Defendants do not dispute that Bonczar has made out a prima facie case of age discrimination, and Bonczar does not dispute that Suburban has articulated a legitimate, nondiscriminatory reason for demoting him.  As discussed above, in the First Circuit, regardless of whether Suburban's reasons for demoting Bonczar were pretextual, Bonczar cannot prevail unless a reasonable jury could infer that, but for its discriminatory animus, Suburban would not have demoted him.  Mesnick v. General Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992).  Therefore, I need decide only whether Bonczar has produced evidence from which a reasonable jury could infer that he was demoted because of his age.

11

Accordingly, pro-youth statements such as those attributed to Feheley, without more, will not support an inference of age discrimination.  Id. at 826.  For example, in Mesnick, the statement by plaintiff's superior that he was "sad to lose the youth of the workforce" could not sufficiently support an inference of discriminatory animus.  Id. (collecting cases).  Even assuming that Spina's reported statements concerning the "old" Suburban culture and employees are admissible evidence, they show at most only that Spina was biased against employees who had been with Suburban for a long time, not that he was biased against older employees.  These statements, and the other statements cited by Bonczar and discussed previously are simply insufficient to permit a reasonable jury to conclude that Bonczar was demoted because of his age.  Therefore, I grant defendants' motion for summary judgment as to plaintiffs' age discrimination claim.

B.    **COUNT II:  WRONGFUL DISCHARGE**

To prevail on a claim of wrongful discharge under New Hampshire law, Bonczar must show (1) that he was discharged out of bad faith, malice, or in retaliation for (2) performing acts which public policy would encourage or refusing to perform acts which public policy would condemn.  Short v. School Admin. Unit

12

No. 16, 136 N.H. 76, 84 (1992).[3]  Essentially, Bonczar claims

that he was discharged for refusing to carry out a company policy

of falsifying customer gain/loss reports to make districts in his

region look more successful than they actually were.  Defendants

argue that Bonczar's claim of wrongful discharge fails for three

reasons.

First, the defendants argue that Bonczar's claim is

precluded by New Hampshire's Whistleblowers' Protection Act, N.H.

Rev. Stat. Ann. ch. 275-E (Supp. 1995).  However, the Act states

explicitly:

> **275-E:5 No Effect on Bargaining or Common Law Rights.**
> This chapter shall not be construed to diminish or
> impair . . . any common law rights.

Therefore, regardless of whether Bonczar has complied with the

conditions for bringing a claim under the statute, it does not

preclude his claim for wrongful discharge.

Second, they argue that Bonczar cannot show that he was

demoted for performing acts which public policy would encourage

or refusing to perform acts which public policy would condemn.

According to the defendants, Bonczar's management errors caused

his demise after he misinterpreted several memoranda Feheley sent

---

[3]  The parties do not dispute that Bonczar was an at-will
employee.  Neither do they dispute that he was constructively
discharged.

13

him.  As a result, Bonczar allowed his district managers to falsify their gain/loss records.  As defendants see it, Bonczar continued to force his subordinates to submit false reports until they complained to Spina.

Bonczar, however, has provided evidence from which a reasonable jury could infer quite a different story.  According to Bonczar's evidence, in early 1991, Feheley made clear to Bonczar and other regional managers that the customer gain/loss reports should be falsified if necessary to demonstrate a positive trend.  Bonczar was concerned about the policy, but also concerned that he might be punished if he objected to it.  Wojewodzic was also concerned about the policy, and raised the issue directly with Spina at a meeting in October, 1991.  That same day, Richardson reported Wojewodzic's comments to Feheley, and Feheley ordered Bonczar to fire Wojewodzic, which Bonczar refused to do.

Bonczar thereafter held two meetings with his district managers to decide how to deal with the policy.  On February 14, 1992, Wojewodzic faxed an emotional letter to Spina, requesting a meeting with Spina, Bonczar, Stec and all the region's district managers to discuss Feheley's policy.  Spina held the meeting, but barred Bonczar, and made clear to the district managers that

14

he would continue to support Feheley.  On February 24, Richardson suspended Bonczar.  After a meeting on February 28, 1992 with Spina, Richardson, and Stec, Richardson and Feheley called Bonczar and told him that he had been demoted to district manager.

Defendants do not dispute that falsifying customer gain/loss reports is an activity which public policy would condemn. Bonczar has provided evidence from which a reasonable jury could infer that he was demoted because he resisted Feheley's policy by refusing to fire Wojewodzic and by holding meetings with his district managers to discuss how best to solve the problem. Therefore, Bonczar has satisfied the public policy requirement of a claim for wrongful discharge.

Third, defendants contend that Bonczar was not discharged for resisting the falsification policy, but for circulating unprofessional memoranda and for lowering the morale of the district managers in his region by showing reluctance to comply with the policies set by upper-level management and by siding with lower-level employees.[4]  For example, in a memo dated May 1, 1991, titled "FIRESIDE CHAT," Bonczar wrote:

_____

[4]  In addition, in a letter dated March 2, 1992, Spina, Richardson, and Stec explained that he was being demoted because he had ordered his district managers to falsify reports.

15

> . . . any memos that I send out to you from Mr. D.R.
> Feheley's office, please read through the threats and
> intimidating verbiage (rhymes with garbage) and just
> try to get the simple point he is trying to get across.
> I really don't have time to rewrite all of his memos.
> . . . And remember those great words of Walt Wojewodzic, who
> once said the only difference between a brown-noser and a
> shit-head is depth perception.

In a memo entitled "Improve Your Bottom Line," headed by a picture of a row of naked babies' bottoms, Bonczar expressed "mixed emotions" about a trip to headquarters, and concluded:

> I only half agree with Gerry Hendrickson when he says that
> bosses are like diapers. They are always on your ass and
> usually full of sh_t!!! Let's show them we can do what's
> needed.

Bonczar also gave Feheley a hat made to look like a condom at a Christmas party in 1990 or 1991 "because of what we had thought of him."

Notwithstanding the defendant's evidence, a reasonable jury could infer from the evidence submitted that until it knew Bonczar was resisting the falsification policy, Suburban thought he was an excellent employee. In twenty years of employment with Suburban, Bonczar had never been reprimanded. In October of 1990, he received a very favorable employee evaluation. One month before his demotion, Bonczar received a silver pin for his outstanding accomplishments. Therefore, a reasonable jury could infer that Bonczar was constructively discharged for resisting

16

Feheley's policy of falsifying customer gain/loss reports, and defendants would not be entitled to summary judgment on the wrongful discharge claim.

Finally, individual defendants Spina, Richardson, Stec, and Feheley argue that the wrongful discharge claim against them must be dismissed because they did not employ Bonczar. Regardless of whether a claim for wrongful discharge sounds in tort or in contract, it rests on an employment relationship between the parties. Miller v. CBC Companies, Inc., 908 F.Supp. 1054, 1067 (D.N.H. 1995). It is undisputed that Spina, Richardson, Stec and Feheley did not employ Bonczar. Therefore, I grant defendants' motion regarding the wrongful discharge claim against individual defendants. Id.

C.    COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In Count III, Bonczar seeks to recover from Suburban and the individual defendants for intentional infliction of emotional distress. New Hampshire's Workers' Compensation Law provides, in pertinent part:

> **281-A:8  Employees Presumed to Have Accepted.  I.** An employee of an employer subject to this chapter shall be conclusively presumed to have accepted the provisions of this chapter and, on behalf of the employee, or the employee's personal or legal representatives, to have waived all rights of action whether at common law or by statute or provided under the laws of any other state or otherwise:

17

> (a)   Against the employer or the employer's insurance carrier . . .; and
>
> (b)   Except for intentional torts, against any officer, director, agent, servant or employee acting on behalf of the employer or the employer's insurance carrier. . .

N.H. Rev. Stat. Ann. § 281-A:8 (Supp. 1995).  Therefore, Bonczar is barred from suing Suburban, his employer, for the intentional tort of intentional infliction of emotional distress.  See Duguay v. Androscoggin Valley Hosp., 1996 WL 157191, *2 (D.N.H. 1996); Thompson v. Forest, 136 N.H. 215, 219 (1992); O'Keefe v. Associated Grocers of New England, Inc., 120 N.H. 834, 835-36 (1980); Censullo v. Brenka Video, Inc., 989 F.2d 40, 43 (1st Cir. 1993); Bourque v. Town of Bow, 736 F. Supp. 398, 404 (D.N.H. 1990).

Bonczar's claims of intentional infliction of emotional distress against individual defendants Feheley, Richardson, Spina, and Stec also fail.  To maintain a claim for intentional infliction of emotional distress, Bonczar must establish that the defendants "by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress [to him]."  Morancy v. Morancy, 134 N.H. 493, 495-96 (1991) (quoting Restatement (Second) of Torts § 46 (1965)).  Bonczar has submitted evidence from which a reasonable jury could infer that he did in fact

18

suffer severe emotional distress.  However, he has submitted no evidence from which a reasonable jury could infer that defendants' conduct went "beyond all possible bounds of decency, and [would] be regarded as atrocious, and utterly intolerable in a civilized community."  Restatement (Second) of Torts § 46 cmt. d; accord Jarvis v. Prudential Ins. Co., 122 N.H. 648, 652 (1982).

### 1. David Feheley

Bonczar submitted evidence indicating that Feheley forced his regional and district managers to lie about their customer losses and gains.  Bonczar also submitted evidence that Feheley participated in the decision to demote him for, inter alia, encouraging district managers.  Feheley also denied Bonczar's first appeal in Suburban's disciplinary review system.  Feheley was not present at the February 19 meeting, he did not sign the letter informing Bonczar of his demotion, and although he was on the telephone, he did not speak while Richardson informed Bonczar of the decision to demote him.  Feheley's behavior, as reported by Bonczar, though reprehensible, was not "extreme and outrageous" enough to allow recovery.  See Brewer v. K.W. Thompson Tool Co., 647 F. Supp. 1562, 1564, 1566-67 (D.N.H. 1986) (no intentional infliction of emotional distress where defendant

refused to provide samples to plaintiff to help him investigate work-related skin condition, thereby preventing plaintiff from obtaining medical release from doctor, then refused to allow plaintiff to return to work without medical release).

## 2. Carl Richardson and Glen Stec

After Spina met with the district managers, Richardson and Stec called Bonczar to suspend him on February 24 without explanation. Stec called Bonczar and ordered him to attend a meeting at the company headquarters in Whippany, New Jersey on February 28 to defend himself. Richardson, Stec, and Spina were at the meeting. Richardson noticed that Bonczar was unusually quiet. Stec observed that Bonczar was upset at the meeting and "seemed to be a little disoriented in trying to understand what was happening" when Stec met him in the lobby beforehand. Richardson was loud and upset and fired questions at Bonczar without listening to his answers. Stec was quiet, and interrupted only once to ask Richardson and Spina to allow Bonczar to answer a question uninterrupted. Spina and Richardson criticized Bonczar for falsifying budget numbers, failing to send in performance appraisals for the district managers, thus preventing the district managers from getting raises, and for falsifying the customer gain/loss reports. Bonczar responded

20

that Feheley's office had forced him to do these things, and that he had organized the February 19 meeting to decide what to do about Feheley. Spina and Richardson also criticized Bonczar for writing unprofessional memoranda. The meeting lasted approximately two and one-half hours. Richardson and Feheley called Bonczar several days later and Richardson told him that they had decided to demote him and (erroneously) that the decision could not be appealed. Bonczar then called Stec, who told him that the decision was appealable.

Stec's conduct was by no means "extreme and outrageous" Morancy, 134 N.H. at 496. Though Richardson was perhaps intimidating and insensitive at the February 28 meeting, his conduct also was far from outrageous. Cf. Miller v. CBC Companies, Inc., 908 F. Supp. 1054, 1068 (D.N.H. 1995) (plaintiff "just barely" survived motion to dismiss where supervisors persistently told her that women should stay home and care for their children and questioned her ability to work and to care for her retarded son simultaneously); Singleterry v. Nashua Cartridge Products, 1995 WL 54440, *6-7 (D.N.H. 1995) (plaintiff alleged facts sufficient to support intentional infliction of emotional distress where defendant supervisor called plaintiff "nigger," physically assaulted plaintiff, and humiliated plaintiff by

21

violating company policy and handing him a letter of warning in front of his co-workers).  Therefore, plaintiff's claims of intentional infliction of emotional distress against Stec and Richardson are dismissed.

### 3.  Dennis Spina

In addition to berating Bonczar at the February 28 meeting, Spina barred Bonczar from the February 19 meeting Bonczar had organized with the district managers.  According to a transcript of the meeting submitted by plaintiff (assuming without deciding that it is admissible), Spina called Bonczar "immature," and criticized his leadership.  Spina explained that he had excluded middle-management, specifically Bonczar, from the meeting because he wanted the district managers to speak freely.  Bonczar has submitted no evidence suggesting that Spina intended to torment Bonczar by excluding him, or that Spina should have known that he would cause Bonczar severe mental distress by excluding him. Like Richardson, although Spina may have acted inappropriately by insulting Bonczar at the February 19 meeting and by being angry and insensitive at the February 28 meeting, his conduct was neither extreme nor outrageous.  The intentional infliction of emotional distress claim against Spina is dismissed.

22

## D.  COUNT IV:  DEFAMATION

Because both libel and slander are evaluated as defamatory statements, I need not distinguish between them.  See Morrissette v. Cowette, 122 N.H. 731, 733 (1982); Restatement (Second) of Torts § 568 (1977).  To prove defamation under New Hampshire law, a private individual plaintiff must show that the "defendant failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party."  Independent Mechanical Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 138 N.H. 110, 118 (1993); accord Duchesnaye v. Munro Enterprises, 125 N.H. 244, 250 (1984).  A statement is defamatory only if it "tends to lower the plaintiff in the esteem of any substantial and respectable group of people."  Nash v. Keene Pub. Corp., 127 N.H. 214, 219 (1985).  Statements that are substantially true are not actionable.  Simpkins v. Snow, 139 N.H. 735, 740 (1995).

Opinions can serve as the basis for a defamation claim if the opinion reasonably implies false and defamatory facts.  Milkovich v. Lorain Journal Co., 497 U.S. 1, 20-21 (1990); Duchesnaye, 125 N.H. at 249.  However, a statement of opinion is not actionable unless it is "sufficiently factual to be susceptible of being proved true or false."  Milkovich, 497 U.S.

23

at 21; accord Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724, 727-28 (1st Cir.), cert. denied, 504 U.S. 974 (1992).  Further, an opinion cannot constitute defamation if it is apparent from the surrounding context that the opinion is based solely on disclosed non-defamatory facts.  Standing Committee on Discipline of the U. S. Dist. Court for Cent. Dist. of Cal. v. Yagman, 55 F.3d 1430, 1439 (9th Cir. 1995); Nash, 127 N.H. at 219; Restatement (Second) of Torts § 566 cmt. c (1977) ("A simple expression of opinion based on disclosed . . . nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is").

New Hampshire recognizes a conditional privilege for statements that "although untrue, were published on a lawful occasion, in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds of its truth" as long as the statements were not made with actual malice.  Simpkins, 139 N.H. at 740 (internal quotation omitted).  I examine the challenged statements individually in light of the applicable standard.

### 1.  Spina's Statements at the February 19 Meeting

Bonczar contends that Spina defamed him at the February 19

24

meeting with district managers in the following exchange, and specifically complains of the statements in bold:

> Walt Wojewodzic:   You mentioned the overtime figures are way out of whack from what budget was.
>
> Dennis Spina:   ah ah
>
> Walt Wojewodzic:   Ok well, Diane our regional coordinator faxed a . . . faxed to Mike Bonczar our Regional manager, and this is exactly what it said "the budgeted overtime figures we used  where [sic] dictated by Dave Feheley"
>
> Dennis Spina:  Well I would say that ah . . **that's a very poor memo and very immature of Mike Bonczar to do that.**
>
> Walt Wojewodzic:   That was his regional coordinator it wasn't . . .
>
> Dennis Spina:  I don't care who it was . . Whoever did that he had to sign off on it or say something. That was very immature, and let me tell you something it sounds like we got management here passing the heat.  That is not leadership.  You do things because there [sic] right.  Not because Mike Bonczar said, not because Dave Feheley said, not because ah. . [. . .] **Any manager who says and I include you, that says "I'm doing this because my manager told me to do it", shouldn't be in that job.**

Bonczar does not specify what he thinks the cited statements mean or why he considers them to be defamatory.  For the sake of argument, I presume they mean that, assuming Bonczar blamed Feheley for inflated or falsified figures, the memo in which he did so was an example of poor management and indicated a lack of maturity, and that a manager who blames upper-level management is

25

not performing his job adequately.  Thus, Spina did not disclose that Bonczar had passed the memo from the regional coordinator straight to the district managers in an attempt to shift blame for the overtime figures from himself to Feheley.  That fact, apparently, was already known to the district managers, or at least to Walt Wojedzowic.  Spina merely offered his opinion that it was immature of Bonczar to blame Feheley without doing anything to correct the problem.  Even assuming that the second statement refers to Bonczar, and is not just a general statement of Spina's management philosophy, it is merely Spina's opinion of the disclosed facts presented to him by the district managers.[5] Therefore, I grant summary judgment in favor of defendants regarding these statements.

## 2.  The March 2, 1992 Letter

Bonczar also claims that the March 2, 1992 letter from Richardson, Spina, and Stec explaining their reasons for demoting him is defamatory.  Bonczar does not specify which statements in the letter are defamatory, but states generally that the letter "attribut[es] to Bonczar conduct which he did not do, and

---

[5]  Plaintiffs argue that Spina's opinions are nevertheless defamatory because they were offered with actual malice. Plaintiffs misunderstand the law.  See Simpkins v. Snow, 139 N.H. 735, 740 (1995).

26

attribut[es] to him bad management for following the directions of his own younger supervisor, Feheley."  The letter states, in pertinent part:

> Mike, it is only fair to say that your failure in part to display these [leadership] traits has resulted in the loss of management focus within Region 16.  Issues raised in the meeting with your managers ranged from being required to falsify customer gain and loss reports, not receiving performance appraisals, not understanding  (or their perception of) how their budgets were approved, letters to your managers which were unprofessional, not supporting the priorities being directed by your superiors, and so forth.

Bonczar does not contend that the letter was published to any third parties, but instead urges me to accept the "self-publication" doctrine.  Bonczar admits that New Hampshire has not addressed the issue of self-publication.  However, even if New Hampshire law recognized defamation by self-publication, I would not hold the above statements to be defamatory because Bonczar has failed to offer sufficient evidence to permit a finding that the statements are false.  See Independent Mechanical Contractors, 138 N.H. at 118.  The letter essentially states (1) that Bonczar lacked leadership skills and (2) that at the February 19 meeting with Spina, Bonczar's district managers discussed various issues and complaints, including falsification of reports.  Bonczar has not presented evidence from which a reasonable jury could infer that he did not in fact go along with

27

the policy of falsification, knowing it was wrong, and shift the blame from himself to Feheley. When Spina, Stec and Richardson charged Bonczar with a lack of leadership in their letter, they referred to Bonczar's failure either to change or take responsibility for the policy of falsification.

Bonczar has not presented evidence from which a reasonable jury could infer that the issues listed were not raised at the meeting between Spina, Stec and the district managers. The transcript of the incomplete tape of that meeting submitted by plaintiff suggests that such issues <u>were</u> raised at the meeting. For example, it records the following exchange:

> Judy Lowell: We had a regional meeting, I can't remember exactly where, but everyone in this room was there and I spoke up as I've been with Suburban for 17 years . . . we where [sic] taught never to lie, not to cheat, and I brought it up at the meeting and said that I didn't like lying and I didn't like cheating and I wasn't going to and I was told to lighten up and play the game.
>
> Skip Walz: That's correct
>
> Walt Wojedwozic: Exactly
>
> Judy Lowell: North Conway
>
> Skip Walz: That was in North Conway.
>
> Dennis Spina: By whom?
>
> Judy Lowell: Michael Bonczar.
>
> Dennis Spina: Why is the focus on Dave Feheley then?

28

Walt Wojedwozic:    Because this is being dictated by
Dave Feheley to the Regional . . .

Finally, Bonczar does not deny that he required his district managers to falsify reports, and the tape transcript he submitted suggests that he in fact did so.  Neither does he deny that he failed to give his district managers performance appraisals.  It is also undisputed that he sent at least two unprofessional memoranda.  Bonczar argues vehemently that he did not fully support Feheley's policy of falsifying numbers -- thus it is true that he was not "supporting the priorities being directed by [his] superiors."  Because Bonczar has not provided evidence from which a reasonable jury could conclude that any of the statements in the March 2, 1992 letter are false, I grant summary judgment on this point in favor of defendants.

### 3.    Statements to Suburban employees that Bonczar was suspected of theft

Although not alleged in the complaint, Bonczar alleges in his objection to defendants' motion for summary judgment that sometime after he was suspended, "management" told unspecified Suburban employees that Bonczar was suspected of theft. Bonczar's only evidence is his own vague response to one of Suburban's interrogatories in which he states:  "it has come to my attention that since I filed this lawsuit, certain Suburban

29

employees asked my old employees questions which questions [sic] indicated that I was being accused and suspected of theft." Because he failed to specify who said what to whom, he has failed to notify the defendants of his claim against them with the requisite degree of specificity.  See Gendron v. St. Pierre, 72 N.H. 400, 401 (1903) (plaintiff claiming slander must specify the offensive language); Bassett v. Spofford, 11 N.H. 127, 128 (1840) (same).  In sum, I grant defendants' motions for summary judgment on all of Bonczar's defamation claims.

E.    COUNT V:  INTERFERENCE WITH CONTRACTUAL RELATIONS

Bonczar alleges that Feheley interfered with his contractual relations with Suburban.  To maintain this claim, Bonczar must show: "(1) [he] had an economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally and improperly interfered with this relationship; and (4) [Bonczar] was damaged by such interference." Demetracopoulos v. Wilson, 138 N.H. 371, 373-74 (1994) (quoting Jay Edwards, Inc. v. Baker, 130 N.H. 41, 46 (1987); Emery v. Merrimack Valley Wood Products, Inc., 701 F.2d 985, 988 (1st Cir. 1983)).  Whether an employer can be deemed a third party where the defendant is an employee of the employer depends on whether the individual defendant acted within the scope of her

30

employment.  See Soltani v. Smith, 812 F. Supp. 1280, 1296 (D.N.H. 1993); see also Alexander v. Fujitsu Business Communication Sys., 818 F. Supp. 462, 470 (D.N.H. 1993) (employer was not third party where plaintiff employee alleged that defendant employee at all times acted as employer's agent).

Bonczar contends that Feheley was acting outside the scope of his employment when he ordered Bonczar to lie and then helped to terminate him for resisting because Feheley was motivated in part by a desire to better his own position within the company.[6] However, Bonczar has produced no direct evidence of this motivation.  Instead, he would ask the jury to infer that Feheley acted to benefit himself either because, as Feheley's

---

[6] Bonczar also claims that Feheley was acting outside the scope of his employment because he was motivated by actual malice, citing Piekarski v. Home Owners Sav. Bank, F.S.B., 956 F.2d 1484, 1495 (8th Cir.), cert. denied, 506 U.S. 872 (1992). In Piekarski, interpreting the law of Minnesota, the Eighth Circuit Court of Appeals stated that the plaintiff's former superior could be held liable for tortious interference with contractual relations if he acted with "actual malice." The court cited a case in which the Minnesota Supreme Court stated that a superior may be held liable if she is "predominantly motivated by malice and bad faith, that is, by personal ill-will, spite, hostility, or a deliberate intent to harm the plaintiff employee." Nordling v. Northern States Power Co., 478 N.W. 2d 498, 507 (Minn. 1991). Assuming, without deciding, that the New Hampshire Supreme Court would recognize this doctrine, plaintiff has submitted no evidence from which a reasonable jury could infer that Feheley was predominantly motivated by malice. Cf. Soltani, 812 F. Supp. at 1285, 1297.

subordinate, Bonczar was a "thorn" in Feheley's side or because Feheley stood to gain in some unspecified way if Bonczar was demoted or discharged.  Construing the evidence in the light most favorable to Bonczar, I conclude that the evidence is simply insufficient to permit a reasonable jury to conclude that Feheley was acting solely for his own benefit when he took the action of which Bonczar complains.  Accordingly, Feheley was not a "third party" to Bonczar's employment contract with Suburban and Feheley is entitled to summary judgment on this claim.[7]

## F.    COUNT VI:   BREACH OF CONTRACT

In Butler v. Walker Power, Inc., 137 N.H. 432, 436 (1993), the New Hampshire Supreme Court distinguished two ways in which an employee handbook may modify at-will employment.  First, the handbook may constitute an employment contract, and set the

---

[7]  Even if Feheley acted partially to benefit himself and partially to further Suburban's interest in making the company more attractive for purchase, mixed motivation does not convert Suburban into a "third party" for purposes of this claim.  See Restatement (Second) of Agency § 236 cmt. b ("The fact that the predominant motive of the servant is to benefit himself. . .does not prevent the act from being within the scope of employment").  See also Daigle v. City of Portsmouth, 129 N.H. 561, 580 (1987) (police officer's off-duty beating of suspect was within scope of employment where it was "actuated to some degree by an object to discharge a law enforcement responsibility" (emphasis added)); Appeal of Griffin, 140 N.H. 650 (1996) (in context of workers compensation, activity of mutual benefit to employer and employee may be within scope of employment).

32

duration of employment, so that the employee is no longer at-will, but hired for a term.  See id.  Additionally, the handbook may offer "incidental benefits," including disciplinary procedures which the employer must follow.  See id.  In such a case, the employee remains at-will, but is entitled to the incidental benefits in return for her continued work for the employer.  See id.  Although the employer may terminate the employee at any time, a failure to provide the promised incidental benefits in the handbook may constitute a breach of contract.  See id.  The court further explained:

> The [employee] well might make a case asserting damages from failure to follow the step discipline procedure as a contractual incident of employment, unrelated to any durational claim.  The ultimate act of termination would be a thin reed for such a case, since the right to arbitrary termination, absent violation of public policy, remains in the hands of the employer.  Damages must arise from failure to follow the procedure short of termination.

Id. at 437.

Bonczar does not dispute that he was an at-will employee, and does not argue that the EARS handbook he received from Suburban modified his status as an at-will employee by setting the duration of his employment.  Instead, he argues that the EARS handbook is a contract between himself and Suburban in which Suburban promises to follow certain disciplinary procedures.

33

Under New Hampshire law, an employee handbook is an enforceable contract if the requirements of unilateral contract formation are satisfied. Panto v. Moore Business Forms, 130 N.H. 730, 737, 742 (1988). There must be a unilateral offer, acceptance, and consideration. Id. at 742. A communication from the employer constitutes an offer if (1) it manifests an intent to be bound, id. at 735, (2) is "so definite as to its material terms or require[s] such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain," Chasan v. Village District of Eastman, 128 N.H. 807, 815 (1986), and (3) contains no effective disclaimer. See Butler, 137 N.H. at 435. The requirements of acceptance and consideration are satisfied by the employee's continued work for the employer. Panto, 130 N.H. at 737-38, 741.

Bonczar argues that Suburban breached its contract by failing (1) to provide an "ethical" and "humane" disciplinary system, (2) to follow the specific procedures set out in the handbook, and (3) to carry out the contract in good faith.

**1.   Did Suburban make an enforceable promise to be ethical and humane?**

Bonczar argues that Suburban breached its promise in the handbook to deal with disciplinary matters in an ethical and humane manner. The EARS handbook states, at the beginning of a

34

section entitled "EARS POLICY OVERVIEW":

> Consistent with our values of being Ethical, Humane, and Demanding, we believe that our employees should have the right and the opportunity to get job related problems listened to and resolved - fairly and quickly. For that reason, we've implemented the EARS . . . Procedure.

This quoted passage merely explains, in very vague terms, why Suburban is offering the EARS; it promises nothing. Thus, I reject Bonczar's contention that Suburban contracted to provide an ethical and humane disciplinary system. See Burr v. Melville Corp., 868 F.Supp. 359, 364-65 (D. Me. 1994) (interpreting New Hampshire caselaw) (statement in employee handbook that "[e]mployees released for inability to perform should have at least two documented counselling sessions preceding the release" did not manifest an intent to be bound) (emphasis in original).

## 2. Did Suburban deny Bonczar specific disciplinary procedures it contracted to provide?

Bonczar claims that Suburban was obligated to follow the specific EARS procedures set forth in the handbook, and that it failed to do so.[8] The disciplinary procedures set out in

---

[8] In their Objection, defendants state: "Plaintiff does not even allege that Suburban failed to follow the EARS process." The Complaint, however, alleges "Defendant Suburban breached its promise to . . . Plaintiff to provide an in-house progressive disciplinary system based on an ethical and humane set of procedures . . . ." Though perhaps poorly drafted, the Complaint does allege that defendant Suburban failed to follow the promised

35

definite terms how Suburban will handle disciplinary problems. Furthermore, in the handbook Bonczar submitted, there is no disclaimer.[9]  In <u>Butler</u>, the New Hampshire Supreme Court held that a similar set of disciplinary procedures were enforceable. <u>See</u> 137 N.H. at 436.  Therefore, a triable case exists as to whether Suburban unilaterally offered to carry out the disciplinary procedures stated in the EARS handbook submitted by plaintiff.  Bonczar satisfied the acceptance and consideration requirements for unilateral contract formation by continuing to work for Suburban.  Therefore, viewing the evidence in the light most favorable to the plaintiff, the procedures set out in the EARS handbook constitute a contract.

The EARS handbook describes essentially a three-step process for the review of adverse disciplinary decisions. Before the employee may take advantage of this process, she must discuss the problem with her immediate supervisor. If the problem remains

_____

disciplinary procedures.

[9]  Defendants submitted a copy of a disclaimer which they refer to as "a preface to all of Suburban's employee policies." However, this disclaimer does not appear in the handbook submitted by plaintiff, and defendants provide no explanation of where it came from.  At best, defendants have shown that there is a factual dispute as to whether the EARS handbook contained a disclaimer, thus they cannot prevail on this issue on summary judgment.

unresolved, the employee first submits a written complaint to her supervisor, and the supervisor responds in writing. Second, the employee submits a written rebuttal to the next two higher levels of management. The reviewing authorities investigate the problem, and either affirm or reverse the decision. Third, the employee appeals in writing to the Area Human Resources Manager and (for regional managers and above) an Executive Review Board ("ERB") reviews the disciplinary decision.

Bonczar claims that Suburban failed to follow the EARS process by allowing Feheley to judge his step two appeal and by putting his step three appeal on hold. Bonczar has submitted evidence that Stec told him he could essentially skip to step two of the appeals process.[10] Bonczar appealed to Spina, Richardson and Stec (presumably, the president and vice presidents at headquarters were the next two levels of management above Feheley), but Feheley considered and denied his appeal. Thus, a triable case exists as to whether Suburban breached its promise that upper level managers would consider and decide Bonczar's step two appeal.

Suburban does not dispute that Bonczar complied with the

---

[10] Thus, defendant waived its complaint that Mr. Bonczar failed to speak to Feheley and to complete step one of the process.

requirements for a step three review by an ERB, nor that it denied him a step three review. According to Bonczar, Suburban did so because Bonczar was unable to attend a meeting of the Executive Review Board ("ERB") in Whippany, New Jersey. The EARS handbook states that the ERB "will review all relevant information, conduct any additional investigation deemed necessary, and make a decision to uphold, overturn, or modify the contested action." It does not require the employee to attend any additional meetings. Furthermore, Stec testified at his deposition that the step three appeal could have been completed without meeting with Bonczar. Therefore, a reasonable jury could find that Suburban breached its contract by denying Bonczar a step three appeal.

### 3. Did Suburban breach the implied covenant of good faith and fair dealing?

Plaintiff argues that Suburban failed to carry out its promise to provide the disciplinary system outlined in the EARS handbook in good faith. In <u>Centronics Corp. v. Genicom Corp.</u>, 132 N.H. 133, 143, (1989), the New Hampshire Supreme Court held:

> [U]nder an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion,

38

consistent with the parties' purpose or purposes in contracting.

Id. at 143.

The court articulated the following four questions to guide courts deciding a claim for breach of the implied covenant of good faith:

1. Does the agreement ostensibly allow to or confer upon the defendant a degree of discretion in performance tantamount to a power to deprive the plaintiff of a substantial portion of the agreement's value? . . .

2. If the ostensible discretion is of that requisite scope, does competent evidence indicate that the parties intended by their agreement to make a legally enforceable contract? . . .

3. Assuming an intent to be bound, has the defendant's exercise of discretion exceeded the limits of reasonableness? . . .

4. Is the cause of the damage complained of the defendant's abuse of discretion, or does it result from events beyond the control of either party, against which the defendant has no obligation to protect the plaintiff? . . .

Id. at 144.

The EARS gave Suburban discretion sufficient to deprive Bonczar of a substantial portion of the contract's value. I have already held that the EARS handbook created a legally enforceable contract. The damage complained of is the demotion, which resulted from defendant's abuse of its discretion to decide

39

disciplinary appeals.  Therefore, I need only decide whether Suburban's exercise of discretion exceeded the limits of reasonableness.

Suburban does not dispute that Feheley decided Bonczar's step two EARS appeal.  Because Bonczar blamed Feheley for his employment problems, the likelihood that Feheley would agree with Bonczar was very slim.  Furthermore, Bonczar has submitted evidence from which a reasonable jury could infer that Suburban permanently replaced Bonczar before the EARS review process was complete, and that Suburban had no other regional manager positions available.  Thus, a reasonable jury could find that Suburban never intended to reconsider its decision to demote Bonczar, but intended only to deny his appeal without review at each stage of the EARS.  Therefore, I deny defendant's motion for summary judgment as to Bonczar's claim for breach of the implied covenant of good faith and fair dealing.  See Silva v. University of New Hampshire, 888 F. Supp. 293, 331-32 (D.N.H. 1994) (university's motion for summary judgment denied where plaintiff claimed university breached implied covenant of good faith by failing to follow its disciplinary policy).

In sum, I grant defendant Suburban's motion for summary judgment as to plaintiff's claim that Suburban breached its

promise to be ethical and humane.  I deny Suburban's motion as to plaintiff's claims that Suburban failed to follow the specific procedures outlined in the EARS and breached the implied covenant of good faith.

## G.   COUNT VII:   LOSS OF CONSORTIUM

Jo-Ann Bonczar brings a claim of loss of consortium.  N.H. Rev. Stat. Ann. 507:8-a (Supp. 1995) states:

> . . . a wife or husband is entitled to recover damages for loss or impairment of right of consortium whether caused intentionally or by negligent interference.  Where fault on the part of the claimant or the claimant's spouse is found to have caused, in whole or in part, the injury to the spouse on which the claim for loss or impairment of consortium is based, damages recoverable shall be subject to diminution to the extent and in the manner provided for in RSA 507:7-d.

Because I have granted summary judgment in favor of individual defendants Spina, Richardson, Feheley, and Stec on all other claims, I grant summary judgment in their favor on this claim as well.  I denied summary judgment to defendant Suburban, however, on plaintiff's claims of wrongful discharge, breach of contract, and breach of the duty of good faith and fair dealing.

Without citing any New Hampshire law, defendants argue only that where injury to one spouse is purely pecuniary, the uninjured spouse may not claim loss of consortium.  Here, however, plaintiff alleges that the wrongful discharge also

41

caused him mental anguish. Because defendants have presented no other argument or caselaw to the contrary, their motion for summary judgment on this point with respect to defendant Suburban is denied.[11]

## IV. CONCLUSION

For the foregoing reasons Richardson's motion for summary judgment (document no. 40) is granted. Feheley, Spina, Stec, and Suburban's motion for summary judgment (document no. 39) is granted with respect to all claims against individual defendants and the claims against Suburban for age discrimination, intentional infliction of emotional distress, and defamation, but denied with respect to the claims against Suburban for wrongful discharge, breach of contract, breach of the duty of good faith and fair dealing, and loss of consortium.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

September 30, 1996

---

[11] Since it was not raised by the parties, I take no position on the issue of whether a wrongful discharge claim states a claim in contract or tort.

42

cc:  Nancy Richards-Stower, Esq.
     Garry R. Lane, Esq.
     William B. Miller, Jr., Esq.
     Martha V. Gordon, Esq.